**HOTEL AND RESTAURANT EMPLOY-EES UNION, LOCAL 25, et al., Appellants**

v.

**William French SMITH, U.S. Attorney General, et al.**

No. 84–5859.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc June 4, 1987.

Decided May 20, 1988.

As Amended May 20, 1988.

Michael H. Gottesman, for appellants. Richard A. Boswell also entered an appearance for appellants.

James M. Spears, Deputy Asst. Atty. Gen., with whom Richard K. Willard, Asst. Atty. Gen., Michael Jay Singer and Gregory C. Sisk, Attorneys, Dept. of Justice, were on the brief for appellees. Joseph E. diGenova, U.S. Atty., Thomas W. Hussey, Mark C. Walters and Patricia Kenney, Attorneys, Dept. of Justice also entered appearances for appellees.

Arthur Lazarus, Jr. and Richard H. Wyron also entered appearances for amicus curiae American Council for Nationalities Service.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG,[*] BORK,[**] STARR,[*] SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE,[*] Circuit Judges.

PER CURIAM: The judgment of the district court is affirmed by an equally divided court.

Separate Opinion filed by Circuit Judge MIKVA, in which Chief Judge WALD and Circuit Judges ROBINSON and EDWARDS join.

Separate Opinion filed by Circuit Judge SILBERMAN, in which Circuit Judges BUCKLEY, WILLIAMS and D.H. GINSBURG join.

MIKVA, Circuit Judge:

A long time ago, the plaintiffs Hotel and Restaurant Employees Union, Local 25, and one of its members, Mauro Hernandez, sued the defendants, the Attorney General and the Secretary of State of the United States, seeking extensive revisions in the procedures used by the Immigration and Naturalization Service ("INS") in its treat-

---

[*] Circuit Judges Ruth B. Ginsburg, Starr and Sentelle did not participate in this decision.

[**] Circuit Judge Bork was a member of the en banc court but resigned prior to issuance of this opinion.

ment of Salvadoran aliens. The district court held that defendants were entitled to summary judgment in this lawsuit. A divided panel of this court remanded to the district court for reconsideration of its decision to grant summary judgment while plaintiffs' important discovery requests were pending. In all other respects, the panel upheld the district court's decision. 804 F.2d 1256.

The dissenting panelist contended that the plaintiffs lacked standing to make their challenge and that the entire lawsuit should have been dismissed. A majority of the judges on this court determined that the matter should be reheard *en banc*. The panel opinion was accordingly vacated, 808 F.2d 847, and the matter was reheard. Recusals and a resignation now leave the court equally divided, 4 to 4, in this case. The decision of the district court therefore stands affirmed.

As a result, the separate "opinions" issued today, which line up on either side of the justiciability questions aired *en banc*, carry no weight and determine no law of the circuit. It is also unlikely they will shed much light. A reasonable regard for our colleagues' views in disagreement, however, compels our brief statement of how we believe this appeal should have been resolved.

### I. Introduction

There is no dispute that the number of illegal aliens present in this country is large and growing. Congress, the Administration, and, from time to time, the courts, have struggled with the problem and sought reasoned responses to the challenges that are brought by, on behalf of, or against such aliens.

Illegal aliens in the United States face the constant possibility of deportation. More importantly, they face the uncertainty of uneven procedures which determine whether they will be allowed to remain or will be forced to go. Attempting to remove this omnipresent threat and its accompanying uncertainties, plaintiffs brought this suit. An understanding of the changes plaintiffs seek in the methods used by the

INS to determine Salvadoran aliens' fate requires a brief summary of the statutory framework and procedures governing immigration and asylum.

### A. *Statutory Background*

In the Immigration and Nationality Act of 1952 (the Act), 8 U.S.C. § 1101 *et seq.* (1982), Congress exercised its plenary power over immigration. The statute regulates the conditions under which aliens may enter and remain in the United States, and vests in the Attorney General broad authority to enforce these conditions. The Act directs that illegal aliens are to be deported by order of the Attorney General upon a determination that they were excludable at the time of their entry into the United States or that they entered the country without inspection. *Id.* § 1251(a) (setting forth categories of deportable aliens). To fulfill this statutory mandate, the Attorney General is authorized to "establish such regulations ... and perform such other acts as he deems necessary." *Id.* § 1103(a). The INS, in turn, possesses the delegated authority of the Attorney General to enforce the immigration and nationality laws. *See* 8 C.F.R. § 2.1 (1985).

While the Attorney General and his delegates possess broad latitude in enforcing the Act, they must respect the procedural rights Congress has granted to aliens facing deportation proceedings. INS determinations of deportability are made in an adversarial hearing before an immigration officer, following notice to the alien of the specific charges against him. 8 U.S.C. § 1252(b). At this hearing the alien has the right to be represented by counsel, to introduce evidence, and to cross-examine evidence put on by the INS. *Id.;* 8 C.F.R. § 242.16. The alien may appeal the immigration judge's decision to the Board of Immigration Appeals (BIA), 8 C.F.R. §§ 236.7 & 242.21, and the Board's decisions in turn are reviewable by the United States Court of Appeals. 8 U.S.C. § 1105a(a).

Congress has established various avenues for obtaining an exemption from deportation. Applying for political asylum is

one such exemption. The Refugee Act of 1980 requires the INS, under procedures established by the Attorney General, to grant political asylum to any applicant who qualifies as a "refugee." *Id.* § 1158(a); *see also* 8 C.F.R. Part 208 (1985) (procedures for reviewing applications for asylum). A refugee, in turn, is defined as a person who is outside any country of that person's nationality and who is unwilling or unable to return to his country because of persecution or a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An alien seeking refugee status has the burden of establishing that he meets the statutory standard as a refugee in order to qualify for asylum. 8 C.F.R. § 208.5.

To seek asylum, an alien may apply to an INS district director. *Id.* § 208.3(a). The district director's decision is not subject to review, *id.* § 208.8(c), but the alien may renew the application in the event that the INS later begins deportation proceedings against him. If the INS has already commenced deportation proceedings against him, an alien may apply for refugee status to the immigration judge who is presiding over the pending proceeding. 8 U.S.C. § 1253; C.F.R. §§ 208.3(b). An alien may seek review of the immigration judge's asylum decision by the normal appeal route.

Whether the asylum application comes before a district director or an immigration judge, INS regulations require the decisionmaker to request an advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs (BHRHA). 8 C.F.R. § 208.7; § 208.10(b). The purpose of this requirement is to assure that the INS draws upon the expertise of the State Department in refugee matters. When such an advisory opinion is sought from the BHRHA, the Office of Asylum Affairs (OAA) is primarily responsible for preparing it. Within the OAA, the official responsible for applications submitted by aliens from Latin American, Central American, and Caribbean countries is a former Foreign Service officer and now a part-time contract employee of BHRHA.

The same official has reviewed applications for asylum since 1974. After reviewing the available materials, and sometimes drawing upon the country-specific expertise of other State Department employees, he issues an opinion on each application. The opinion is reviewed by the Public Policy Officer for the Bureau of Inter–American Affairs at the State Department. The opinion letter is then signed by the Director of OAA and forwarded to INS.

When the application returns to INS, the applicant may inspect, explain, and rebut the Bureau's advisory opinion. 8 C.F.R. § 208.10(b). The INS decisionmaker must examine the individual asylum applicant personally before resolving the application. *Id.* § 208.6. In the vast majority of cases, the INS has denied Salvadorans' applications for asylum.

In contrast with asylum, which is a statutory exemption from deportation for individual aliens, Extended Voluntary Departure (EVD) is a discretionary suspension of deportation proceedings applicable to particular groups of aliens. While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors.

### B. *Procedural Background*

Because the merits of this appeal have been obviated by a tie vote, there is no need to again detail the proceedings in the district court. We rely on the separate opinion's statement of the allegations made by plaintiffs and proceed directly to the threshold issues of standing and ripeness which divide this court. Before doing so, however, we reiterate our view, set forth in the vacated panel opinion, that the district court should not have granted summary judgment without justifying its disregard of plaintiffs' requests to examine INS files on all Salvadoran national asylum applicants and to obtain a breakdown by nationality of the State Department's asylum rec-

ommendation rates. Since we believe that the plaintiffs here have standing to sue and that the controversy is ripe for review, we would remand to the district court for proper consideration of these discovery requests.

## II. THRESHOLD ISSUES

### A. *Plaintiffs Have Standing*

Appellees argue that plaintiffs lack standing; they contend that neither the individual nor the organizational plaintiff has alleged cognizable injury as a result of defendants' activities. We believe, however, that the plaintiffs have standing to sue. Salvadoran national Mauro Hernandez, whose application to an INS district director for asylum has been denied, alleges that the INS' consultative procedures with the Department of State, and the agency's refusal to grant EVD to Salvadorans, are illegal and cause him injury. Hernandez's allegation of concrete, redressable harm to his rights as an alien is sufficient to confer standing. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). In addition, the union is entitled to sue on its own behalf and as representative of its members.

### B. *Representational Standing of the Union*

In resolving the question of an organization's standing as a representative of its members, we are guided, as are Judge Silberman and his colleagues, by the principles set forth in *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), which the Supreme Court has recently reaffirmed. *See International Union, UAW v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986). *See also Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 939 n. 10 (D.C.Cir.1986); *National Treasury Employees Union v. Merit Systems Protection Board,* 743 F.2d 895, 910 (D.C.Cir.1984). In *Washington Apple,* a trade association, created to promote the apple industry of Washington state, sought to challenge a North Carolina state law impeding promotion of Washington-grown apples within North Carolina. In deciding that the association had standing, the Court set forth a three-part test to evaluate claims of organizational standing. First, if the association's members were plaintiffs, they must have standing to sue in their own right. Second, the interests the organization seeks to protect must be germane to its purpose. Finally, neither the claim asserted nor the relief requested must require individual members to participate in the organization's lawsuit.

The first requirement is satisfied if the association's members, " 'or any one of them, are suffering immediate or threatened injury as a result of the challenged action.' " *Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 312 (D.C.Cir.1985) (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975)), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). In evaluating whether the challenged action threatens injury to members, this court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (citations omitted). This court has affirmed that "[a]s a general matter, a plaintiff's standing to pursue a claim rests on the theory of injury presented in the complaint and the facts alleged in support of the claim." At this stage, "the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant." *Haase v. Sessions,* 835 F.2d 902, 907 (D.C.Cir.1987).

The union alleged, and the separate opinion concedes, that a number of its members have applied for asylum, and a number of those have been denied. If their asylum claims have been processed in the illegal manner described, these members have suffered injury. The separate opinion complains it is pure speculation whether union members' applications have been "rubber stamped." This doubt fails to credit the

union's allegations. Plaintiffs assert that the legally defective procedures of which they complain are the INS' routine method of processing Salvadoran applications. If this is true, it is likely that these "practices" were brought to bear on a significant number of this group's asylum requests. In short, plaintiffs have made a sufficient showing for standing: they have established a "likelihood" of injury that rises above the level of "unadorned speculation." *See Pennell v. City of San Jose,* — U.S. ——, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed. 2d 895 (1979) ("A plaintiff who challenges a[n action] must demonstrate a *realistic danger* of sustaining a direct injury as a result of the [action].") (emphasis added)).

The separate opinion implies that members lack standing to challenge the asylum procedures if they would not have been granted refugee status even if accorded due process. Whatever the reason for past individual denials, the aliens remain entitled to a determination cleansed of illegalities. "[T]he right to procedural due process * * * does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). To require for standing that a plaintiff show he would prevail if accorded appropriate process would cut off redress of due process violations in a host of cases. Regardless of the merits of their asylum request, union members would be entitled to sue for compensatory damages (at a minimum, nominal damages) if the government processed their requests illegally. Outcome is irrelevant to standing to pursue a claim of inadequate procedural protection.

The injured union members have standing to sue for the requested declaratory and injunctive relief because their personal interest in correcting the INS' alleged mishandling of Salvadorans' asylum requests is ongoing. In *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed. 2d 675 (1983), *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the Court de-

nied previously injured plaintiffs standing to sue for declaratory and injunctive relief because of failure to establish a sufficient likelihood of future injury. Unlike the plaintiffs in those cases, the alien union members who have standing based on past treatment suffer continuous deprivation and retain an immediate and live interest in procuring the requested relief. They have no hope of changing their status or renewing their plea until the defects in the INS procedures are rectified. Thus, the *Washington Apple* requirement that one or more members of the representative organization have standing to sue is satisfied by those members who hope for procedurally sound consideration of their asylum requests.

Continuing with the *Washington Apple* test for organizational standing, it is also clear that the plaintiffs' theory of the case and the remedies sought do not require the participation of individual aliens. The presence of specific members will add nothing to the union's challenge to the government's procedures. Since the union does not challenge the disposition of any particular asylum request, judicial redress of the defective INS practices requires jurisdiction over no particular Salvadoran alien.

Thus our inquiry narrows to whether the interests the union seeks to protect are germane to the union's purpose. We believe that they are. This court has recently articulated a "modest but sensible" test for organizational germaneness under the second prong of *Washington Apple.* In *Humane Society of the United States v. Hodel,* 840 F.2d 45 (D.C.Cir.1988), we concluded "it is highly unlikely the second prong of germaneness was meant to set the narrow perimeter of centrality of purpose * * *. Rather, it would seem to require only that an organization's litigation goals be pertinent to * * * the grounds that bring its membership together." At 56 (footnote omitted).

The standard in *Humane Society* is more than satisfied here, since this litigation unquestionably aims to enhance the union's success in its central missions. The union's purposes include, *inter alia,* organizing all

workers within its jurisdiction and protecting its members. The union stated that the government's current asylum and deportation policies keep aliens out of the mainstream of the association's business. Understandably fearful and unwilling to come forward, illegal aliens employed by hotels and restaurants in the Washington area do not identify themselves to the union, do not make known their grievances against their employers, and do not become involved in union activities. The union's current effort to protect its members' interest in reformed asylum and deportation procedures is therefore germane to the union's activities as an organization interested in enrolling and protecting Salvadoran members.

The separate opinion never reaches the question of "germaneness," contending that the complaint does not meet the first requirement of concrete injury to the union's members. The opinion states that the alleged defects in processing asylum claims are "without adequate shape or form to permit us to judge the potential dispute." The opinion finds the issue too "ill-defined" to constitute a justiciable "case or controversy."

Our colleagues believe this "indefiniteness" defect sounds in standing but bears on ripeness. Understanding this as a putative problem of standing requires parsing the standing test of a "judicially cognizable injury" into two components. Plaintiff must show "distinct and palpable" injury-in-fact. See *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). However, injury alone will not suffice. The injury must be tied to a controversy that is "fit" for judicial consideration. This "fitness" aspect of standing frequently comes into play to foreclose adjudication of controversies which threaten court interference with areas committed to other branches of the federal government. See *Allen v. Wright,* 468 U.S. 737, 761, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984); *see also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The separation-of-powers problem is not the separate opinion's concern. Its objection

speaks to the court's institutional capacity, not to its constitutional power.

The separate opinion correctly perceives that this issue of the "competence of the courts to resolve disputes," E. Gellhorn and B. Boyer, *Administrative Law and Process* 318–19 (2d ed. 1981) is also an aspect of ripeness. Although competence is but one of an array of ripeness variables, its significance as an obstacle to review often depends on the stage of the adjudication. Ripeness customarily focuses on the timing of review and the benefits of postponing review until the factual setting of the case "becomes sufficiently concrete to be susceptible to adjudication," *Andrade v. Lauer,* 729 F.2d 1475, 1483 (D.C.Cir.1984). When a controversy is found unripe, the "abstractness" in the presentation of the complaint will often be cured by "further administrative refinement of the issues," *Eagle–Picher Indus. v. United States E.P.A.,* 759 F.2d 905, 912 (D.C.Cir.1985) or by concrete application of challenged regulations to specific individuals. The separate opinion implies, however, that tincture of time will not heal what ails this controversy. The opinion proclaims the issues inherently too vague for proper adjudication. Thus, the question is not whether subsequent events will sharpen the dispute for judicial resolution, but whether the issue presented is amenable to judicial determination at all.

Whatever the rubric under which we choose to analyze the requirement of a "well-defined" controversy, it is clear that this aspect of justiciability is at least intertwined with key facets of standing. Practical problems in the definition of a case or controversy shade into questions of injury, causation and traceability. If a plaintiff describes defendant's injurious conduct too abstractly, the court will be uncertain what qualifies as such conduct. The difficulty of determining if an injury is "fairly traceable" to a defendant's actions reflects the difficulty of tracing the consequences of an indefinite act.

Contrary to the separate opinion's assertion, the plaintiffs in this case have identified both the improper practices and the

resulting injury with enough particularity to satisfy the practical requirements of justiciability. The degree of descriptive specificity required is a pragmatic question. The plaintiff's description of defendant's objectionable practices must enable the court to determine with reasonable certainty that the defendant has engaged in the conduct plaintiff seeks to remedy. The court must be able to identify what counts as evidence of the conduct and to confirm or deny whether the defendant acted as plaintiff claims he did.

The allegations that the INS almost always defers to the State Department recommendations, and that the State Department usually disregards individual circumstances, are not susceptible to precise determination and involve consideration of INS decisions that are unavoidably subjective. However, it does not follow that the court is not competent to adjudicate the controversy as framed by plaintiffs. A court is capable of evaluating evidence bearing on whether the INS has ignored individualized circumstances demonstrating a "well-founded" fear of persecution, or given them too little weight. The task of the court in this case does not exceed pragmatic limitations on the court's expertise, since courts habitually judge whether agencies or tribunals have properly taken into account individual circumstances when applying a standard for eligibility or entitlement. A court is likewise capable of deciding whether the INS' disregard of "well-founded fears" is frequent enough to be judged "routine practice." In making this judgment, there is no reason why the court cannot distinguish between exceptional and habitual behavior. In sum, the court is competent to make the judgments necessary to decide this case. We believe that the "practices" in this case have been alleged with sufficient particularity to state a judicially cognizable controversy.

The separate opinion is correct that, even if plaintiffs provide a reasonably coherent characterization of the challenged practices, a minimal factual showing is necessary to rise above the level of naked allegation. We think it clear, however, that this threshold showing has been made. Like Judge

Silberman, we find instructive the comparison between plaintiffs' claim and the claim this court recently considered in *Haase v. Sessions*, 835 F.2d 902 (D.C.Cir.1987). In *Haase*, the plaintiff maintained he was the victim of a government policy of harassing travelers returning from Nicaragua. The court found "the present complaint and supporting materials deficient for purposes of standing." *Haase*, 835 F.2d at 908. The court identified the problem as a lack of "[anything] in the record that plausibly supports the existence of the challenged policy, even 'accept[ing] as true all material allegations of the complaint.'" *Id.* at 910 (citing *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. 2206). Thus, the court concluded that "[t]he deficiency relates to the quantum of proof, rather than to an inherent logical flaw." *Id.* at 908.

In contrasting the instant case with *Haase*, the separate opinion misunderstands both the present claim and the *Haase* court's reasoning. In both cases, plaintiffs have maintained that designated government policies violate the Constitution. The court in *Haase* agreed that Haase would have standing to challenge the policy if it appeared such a policy existed and if Haase would likely be affected by it in the future. In other words, Haase's allegation of a 'pattern and practice' of harassment at the border was not too "indefinite" in form to consider.

In contrast, according to Judge Silberman, the complaint in our case is *logically* defective. But our colleague's own analysis of the defect belies this contention. The problem the separate opinion purports to identify—the lack of "particularized accounts of many * * * incidents"—is not logical; indeed, Judge Silberman acknowledges that a "practice of misuse of advisory opinions" could be inferred by "examining the merits of individual cases." Separate opinion at 1515. As in *Haase*, then, the defect our colleague perceives in the plaintiffs' presentation of the controversy relates to the "quantum of proof."

The separate opinion misdiagnoses a nonexistent problem. The present case is unlike *Haase* precisely in respect of plaintiffs'

sufficient showing at this threshold stage. Through their presentation of affidavits at the trial court level pointing to inadequate assessment of Salvadoran asylum applications generally, plaintiffs have passed beyond the "phantasmal," *Haase*, 835 F.2d at 910, and provided reason to believe the INS evaluation system is defective in the way described. Whatever "quantum of proof" is required at this threshold stage does *not* include particularized accounts of the union members' applications. In short, plaintiffs have done everything necessary to state a claim that the court is competent to decide.

### C. *Standing, Ripeness, and Union Members' Asylum Applications*

Defendants have claimed that the union lacks standing unless it identifies injured union members. The separate opinion agrees, but suggests as well that the issue is not ripe unless the union brings those members' asylum requests before the court for consideration as part of this adjudication. The separate opinion's gloss on the defendants' objection goes wrong in several ways. Above all, its argument suffers greatly from a confusion between an individual's challenge to his treatment at the INS' hands and a structural challenge to the INS' handling of Salvadoran applications. The opinion's discussion assumes that standing to mount this structural challenge, as well as ripeness of the claim, turn on the court's access to, and consideration of, individual union members' case histories. At most, however, facts about the INS' disposition of union members' asylum applications may be needed to evaluate the merits; such facts are not essential to the court's determination that this challenge to an INS "practice" is justiciable. Even at the merits stage, particulars of union members' case histories might well prove unnecessary to the union's success—though here, again, Judge Silberman erroneously assumes otherwise.

The anonymity of union member asylum applicants does not undermine those members' standing to bring this claim. To satisfy itself that the requirements of "injury in fact" and causation have been met, the court need only know that some union members have sought asylum, have been denied, and were probably subjected to the INS' defective procedures and thus detrimentally affected by them. These facts alone ensure members' "personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) and guarantee that "the litigation will be pursued with the necessary vigor." *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968). These union members' personal interest exceeds "merely a generalized citizens' interest." *Andrade v. Lauer*, 729 F.2d 1475, 1494 (D.C. Cir.1984). *See also Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed. 2d 343 (1975). Naming those members adds no essential information bearing on the injury component of standing. Similarly, it is clear at this stage that the previously identified standing requirement of a definite statement of a controversy that is fit for judicial consideration has been satisfied. This element does not require identification by name of injured members or a detailed account of how each union member's application was handled.

In treating this claim as unripe because not presented in the proper factual setting, the separate opinion again fails to distinguish between a general challenge to the INS' entire framework for processing applications and a challenge to the agency's treatment of particular union members' asylum applications. As in *International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), discussed in the separate opinion, plaintiffs here allege that the "guidelines" followed by the INS in processing requests are themselves invalid; "they do not contest the particulars of the application of the guidelines to the facts of individual cases." *Id.* at 279, 106 S.Ct. at 2527 (quoting *International Union, UAW v. Donovan*, 568 F.Supp. 1047, 1050 (D.D.C.1983)). Thus plaintiffs need only describe the INS' customary procedures, not the application of those procedures to named union members' cases.

It is of course clear, as the separate opinion states, that "designating the Government's past behavior a 'practice'

does not convert this process into a categorical policy that can be examined unrelated to the facts or merits of an individual claim." Separate opinion at 1514. The opinion fails to see, however, that the nature of plaintiffs' challenge guarantees that the issue will be considered in the context of specific applications. It is simply not *possible* to examine the challenged "practice" unrelated to facts.

Thus, the separate opinion's picture of a hypothetical and abstract legal issue isolated from a concrete setting reflects an obvious misperception. This is not a case in which plaintiff has "identif[ied] a legal issue that theoretically *could* be resolved in the absence of a specific factual context." *National Ass'n of Rehab. Facilities v. Bowen*, 840 F.2d 931, 934 (D.C.Cir.1988) (Williams, J., concurring) (emphasis in original). On the contrary, unlike in *Brock*, the "guidelines" in this case are not conveniently reduced to textual regulations, but exist only as applied. Therefore, the INS practices cannot be examined apart from their factual setting. Thus, this case cannot be described as one in which no fact-specific situation is involved. If ripeness means to "avoid[ ] * * * entanglement in abstract disagreements," and "protect[ ] [the court] from adjudicating matters that are not sufficiently 'fleshed out' that we may see the concrete effects and implications of what we do," *American Trucking Ass'ns v. ICC*, 747 F.2d 787, 789 (D.C.Cir. 1984), this controversy will not compromise that doctrine's purpose.

We acknowledge that this dispute would not be ripe for consideration if presented as an abstract, anticipatory challenge to a regulatory scheme to be implemented in the future. It is crucial to this lawsuit's ripeness that the episodes of INS behavior revealing the "practice" have all taken place, and that the factual context is fully developed. Plaintiffs allege—and proposed to prove at trial—an INS habit of slighting Salvadoran asylum claims reflected in multiple past episodes. It is also important to ripeness that the INS policy has been made "concrete" in application against the plaintiffs as well as others. These practices have been implemented in the process of considering hundreds of Salvadoran asylum requests—including those of some union members. The claim is therefore not premature, since no further administrative exhaustion is needed to complete the application of law to fact in any instance relevant to this adjudication. Ripeness requires nothing more.

Notwithstanding that all traditional elements of ripeness doctrine are satisfied, the separate opinion demands that the details of INS mishandling of plaintiffs' applications be presented to the court. The opinion fails to see that a threshold assessment of ripeness depends on what has actually occurred, not on whether particular examples of these events are presented. Of course, the court must assure itself that illegal practices are ready to be examined in action and not in abstraction. But the separate opinion offers no reason why such assurance requires plaintiffs to bring forth particular facts about their own cases at this stage of the lawsuit. As with standing, the court need only know that the posture of events central to plaintiffs' contentions is "concrete" and not "abstract." The court can thereby satisfy itself it will not be asked to decide a hypothetical legal question that is not ready for review.

The separate opinion fixates upon a paradigm in which the adverseness required for standing and the concreteness necessary for ripeness flow from a single application of law to fact. In most cases, the plaintiff must plead his own situation—he cannot rely on summaries of others' treatment to reveal the practices which also injure him. In the case *sub judice*, it is possible to satisfy requirements for both ripeness and standing without pointing at the outset to any individuals' cases because the challenged conduct is a *pattern* of behavior that manifests itself in the aggregate.

Having determined that the issues are fit for judicial review, we further note that the court and agency have no interest in "postponing review until the question arises in some more * * * final form." *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 672 (D.C.Cir.1978) (quoting *Continental Airlines v. CAB*, 522 F.2d 107, 124–25

(D.C.Cir.1974) (*en banc*)). There is no reason to believe the INS will abandon or modify its treatment of Salvadoran asylum applications before putting its policies into effect. *Continental*, 522 F.2d at 125. The INS has stated that it follows a clear and ongoing procedure in dealing with these asylum applications. This procedure has been made final, and the agency has implemented its consultative procedures with the State Department. The action plaintiffs challenge here is much more akin to a final agency action than to a tentative agency policy. Thus judicial review would not interfere with the agency's development of a final decision. It would not misuse the court's resources by threatening judicial entanglement in "abstract disagreements over administrative policies." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

A ripeness inquiry sometimes requires examination of the hardship that withholding court consideration would cause to the parties. *Cf. Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515. However, in the absence of any "significant agency or judicial interests militating in favor of delay, we cannot imagine how the hardship factor could ever tip the balance against judicial review." *Payne Enterprises v. USA*, 837 F.2d 486, 493 n. 10 (D.C.Cir.1988). Although the direct, immediate impact of the challenged actions clearly fulfills hardship requirements in this case, *see Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967), we need not weigh hardship since all institutional interests favor immediate review. *See Consolidation Coal v. FMSHR*, 824 F.2d 1071, 1081 n. 11 (D.C.Cir.1987).

Our evaluation of ripeness is thus complete. At this point, we need not address, and are in no position to decide, whether plaintiffs could *prevail* without presenting named members' cases. The union's task at a merits proceeding would be twofold: to prove the pattern of practice, and to convince the court the practice has been applied against union members. There are as many strategies to demonstrate a practice, and as many ways to infer one, as there are Salvadoran immigrants between these shores. The union's demonstration of the INS' alleged defective handling of asylum applications might well entail examination of some specific cases. However, it is not obvious why the "concrete setting" in which INS practice would be examined must be its application against the individuals who are challenging the practice.

It is similarly too early to tell if the court could dispense with consideration of details of union members' asylum quests in making a conclusive determination, crucial to entitlement to redress, that union members' applications were in fact accorded inadequate consideration. If the court were satisfied that INS procedures are constitutionally defective, and if there were no reason to suspect deviation from settled practice, the court might be able to infer that members' applications were processed in accordance with the unlawful routine. If not, presentation of union members' cases without revealing their identities, or by *in camera* disclosure, might be a compromise solution. In any event, there is no reason to demand that the union name names at the outset. Thus Judge Silberman's contention that aliens' fear of detection does not excuse the union's failure to plead necessary facts is beside the point. The union need not justify its silence at the threshold stage since the revelations demanded might prove superfluous.

Because potentially crucial discovery is incomplete, it would be presumptuous for this court to anticipate further the plaintiffs' possible strategies of proof. Such predictions are irrelevant to threshold issues of standing or ripeness. As we have demonstrated, all the ingredients for justiciability are present. Plaintiffs have framed a judicially cognizable issue. They have averred that union members have suffered and continue to suffer injury due to the practices they challenge. The issue presented is sufficiently clear to be susceptible to judicial determination. The issue is ripe because necessarily framed in terms of concrete agency action, and because plaintiffs have submitted to procedures of which they complain. In short, this case is ready to proceed with discovery and consideration

on the merits with the union as representative plaintiff.

### D. *The Union's Organizational Standing*

The standing question is admittedly closer for the plaintiff organization, Local 25 of the Hotel and Restaurant Employees Union, AFL–CIO than for the union in its representative capacity. The union states that approximately one thousand of its members are Salvadorans now present in the United States; some of these members are illegal aliens under threat of deportation. The union argues that it has standing to participate in this lawsuit because its activities and interests, as an organization, are hindered by the procedures that defendants follow against its Salvadoran members. We agree with the district court that the union has standing to bring suit under either of its theories.

To establish standing to sue on its own behalf, the union must "plausibly (1) allege injury in fact derived from the agency's action or inaction [and remediable by the court's order to defendant], and (2) assert that the injury is arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 259 (D.C.Cir. 1983). This first requirement contains three constitutionally mandated components—there must be injury in fact, it must be traceable to the defendant's allegedly unlawful conduct, and it must be likely to be redressed by the relief requested. *See Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936 (D.C.Cir.1986). The second, zone-of-interests requirement is a prudential one. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

We believe that the union has satisfied each of the constitutionally required components of standing. The allegation of injury "need not be large or intense; an 'identifiable trifle'" suffices. *Action Alliance of Senior Citizens*, 789 F.2d at 937 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417

n. 14, 37 L.Ed.2d 254 (1973)). The union in this case has plausibly alleged more than a trifle; it asserts that it has suffered a diminution of its ability to organize and retain Salvadorans as union members and to protect the rights of its members to be secure in their jobs. The union has also satisfied the causation requirement. Plaintiff union traced a direct line between defendants' actions and its own alleged injuries. According to the union, defendants' denial of individualized consideration, which frequently resulted in denial of asylum status, subjects Salvadoran aliens to employer pressure to remain silent or else be reported for deportation. This also results in members' unwillingness to press their grievances against their employers which hinders the union's activities.

In addition to those who have applied for and been denied asylum, the union contains members who wish to secure asylum but have not yet applied. The deterrent effect of defective procedures on this group also contributes to the union's claim of injury which is "fairly traceable" to the INS' allegedly illegal actions. Since these Salvadorans are fearful of unjustified denial of refugee status and relief from the danger of deportation, they are reluctant to call attention to themselves by applying for asylum or by participating publicly in union activities.

We concede that not all the aliens' insecurity is attributable to the procedural irregularities that allegedly mark the political asylum system. Although all aliens are generally insecure, however, a particularized insecurity limited to a smaller segment of illegal aliens can be occassioned by the INS' procedures for processing asylum applications. Finally, the redressability requirement for the union's standing is satisfied; the court could order relief, such as requiring the INS to make revisions in its decisionmaking procedure for asylum applications, that would end the union's injury.

We now turn to the prudential requirement that the interest plaintiff seeks to protect be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in

question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). We have held that "[t]he 'zone' test is passed if a plaintiff's interest in the agency action appears to fall within the ambit of the constitutional clause, statute, or regulation allegedly violated." *Capital Legal Foundation*, 711 F.2d at 258–59 (footnotes omitted). The union's interest here falls within the zone of interests protected by the statutes at issue. The union seeks protection of an organizational interest; that interest is in seeing that members obtain lawful and secure entry status in this country and are accordingly free from the threats of third parties, such as employers, to report them for deportation proceedings if they report grievances or demonstrate pro-union tendencies. The Refugee Act of 1980 and the Immigration and Nationality Act, by erecting a complex scheme of substantive and procedural safeguards for aliens, protect this same interest in secure entry status. We believe that Local 25 of the Hotel and Restaurant Workers asserts and describes a statutorily protected interest in its actual and potential members' access to the opportunities for asylum offered by the Refugee Act. The union is therefore within the zone of interests protected by the statute and has standing to maintain this challenge.

## III. Extended Voluntary Departure

The Attorney General enjoys broad latitude in enforcing the immigration laws. *See* 8 U.S.C. § 1103(a) (authorizing Attorney General to establish such regulations and perform such other acts as he deems necessary to carry out his authority). The decision to grant or to withhold EVD falls within this broad mandate. On several occasions in the past, the Attorney General has granted EVD by temporarily suspending enforcement of the Act for a particular group of aliens. The Attorney General has determined that circumstances do not warrant granting EVD to Salvadoran aliens. This assessment was based upon: (a) the number of Salvadoran aliens already in this country; (b) the current crisis in which our country is experiencing a "floodtide' of il-

legal immigrants; (c) the prospect of inducing further immigration by Salvadorans; (d) the effect of illegal immigration on the United States' finite law enforcement, social services, and economic resources, and (e) the availability of statutory avenues of relief, including application for asylum. These factors correspond to the Secretary of State's description of the EVD process: the State Department "invariably considers a number of factors in deciding whether to recommend the granting of EVD in any particular case, and the granting of EVD may meet different objectives in different cases." Letter from George P. Shultz to William French Smith (June 23, 1983), J.A. tab 17, at 1.

The initial, and dispositive, issue is simply whether the court can review the Attorney General's discretionary withholding of EVD status. We agree with the court below, the panel judges, and our colleagues on rehearing that where, as here, Congress has not seen fit to limit the agency's discretion to suspend enforcement of a statute as to particular groups of aliens, we cannot review facially legitimate exercises of that discretion. We would find unreviewable the Attorney General's decision not to extend EVD status to Salvadoran aliens.

The separate opinion rests its finding of unreviewability on the ground that the Attorney General's decision is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982). We agree the court has no meaningful standard against which to judge the agency's exercise of discretion to deny EVD status in this case. However, we disagree with Judge Silberman's implied conclusion that all possible decisions concerning EVD are categorically insulated from review. Although decisions made by Congress or the President in the area of immigration are subject to a narrow standard of review, discretion is not without bounds. *See Fiallo v. Bell*, 430 U.S. 787, 796, 97 S.Ct. 1473, 1480, 52 L.Ed.2d 50 (1977); *Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976). For example, if there were reason to believe the Attorney General's denial of EVD status to individuals or a group was

motivated by discriminatory racial or religious animus, this court could review such a policy for abuse of discretion.

## IV. CONCLUSION

Six years after the plaintiffs first came to federal court seeking judgment in their dispute with defendants, we are unable to muster a majority of this court to resolve whether they are entitled to come here at all. At the end of this long road, the court's deadlock leaves the union and its members with the results ordained by the district court: entitled to admission, but without relief. Such are the fruits of the convoluted standing and ripeness disagreements which have engulfed this court. We leave to another day, and perhaps another forum, an authoritative resolution of the questions brought before us.

SILBERMAN, Circuit Judge:

By one estimate, there are roughly one-half million Salvadoran nationals residing illegally in the United States. *Hearing on S. 377 Before the Subcomm. on Immigration and Refugee Policy of the Senate Comm. on the Judiciary,* 99th Cong., 1st Sess. 61 (1985) (Testimony of Alan C. Nelson, Commissioner, Immigration and Naturalization Service). Appellants, a labor union claiming to represent a number of such Salvadorans (the "Union" or "Local 25") and one of its members proceeding separately, sued the Attorney General of the United States, the Immigration and Naturalization Service ("INS"), and the State Department, claiming the present regime whereby the Attorney General determines whether or not to grant asylum to Salvadoran immigrants who have unlawfully gained entry into the United States is legally defective. They seek a declaratory judgment to this effect and a mandatory injunction directing the Government to alter its procedures in future cases in which asylum is sought by Salvadoran immigrants. Alternatively, they ask that the Attorney General be directed to suspend all deportation proceedings against Salvadoran nationals—to grant those nationals "Extended Voluntary Departure" ("EVD") status.

The court, sitting en banc, is equally divided on this point, but we would hold that appellants lack constitutional standing to challenge the Government's methodology, and that, largely for the same reasons, the cause is constitutionally unripe. Further, we agree with Judge Mikva's opinion that the Attorney General's determination whether or not to grant EVD to all Salvadoran immigrants is unreviewable; by virtue of this agreement and the 4–4 split on standing and ripeness, the district court opinion is affirmed.

## I.

An alien physically present in the United States or at a border may seek to avoid deportation by applying for asylum. The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980) (codified in scattered sections of 8 & 22 U.S.C.; amending the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101 *et seq.* (1982)), directs the Attorney General to establish procedures for that application and provides that "the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee." 8 U.S.C. § 1158(a) (1982). A "refugee" is defined as "any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). *See generally INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1209–13, 94 L.Ed.2d 434 (1987).

In relevant part, the regulations governing asylum direct that an application be filed with an INS district director, 8 C.F.R. § 208.3(a) (1987), who must request an advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs ("BHRHA"), *id.* § 208.7, before acting on the application. *See also id.* § 2.1 (delegating to Commissioner of Immigration and Naturalization Attorney General's authority relating to immigration and naturalization). This mechanism ensures

that the expertise of the State Department is brought to bear on the application. *See, e.g.,* Preston, *Asylum Adjudications: Do State Department Advisory Opinions Violate Refugees' Rights and U.S. International Obligations?,* 45 MD. L. REV. 91, 112–14 (1986). If the BHRHA opinion is not classified and does form a basis for the asylum decision, the applicant is to be "given an opportunity to inspect, explain, and rebut" the opinion. 8 C.F.R. § 208.8(d). Even if an alien is denied asylum, he can reassert his request for asylum in any deportation proceeding that the government subsequently brings, *id.* § 208.9;[1] denial of asylum does not lead automatically to deportation.

The amended complaint alleges that, in the past, the INS has relied too heavily on the views of the State Department as to whether an applicant has a "well-founded fear of persecution." The key portions of the complaint are as follows:

32. Such recommendation is forwarded to the appropriate Immigration Officer who relies almost exclusively on the opinion of the State Department when making his or her decision.

33. Plaintiff alleges on information and belief that in issuing advisory opinions on asylum cases filed by Salvadorans, the State Department routinely recommends against the grant of asylum without regard to the merits of the individual asylum claims.

34. Plaintiff alleges on information and belief that the State Department routinely issues form letters recommending against the granting of asylum to Salvadoran applicants and said form letters fail to consider the merits of the individual asylum claims.

35. Plaintiff alleges on information and belief that Defendants and their agents automatically and as a matter of practice engage in the acts described in paragraphs 33 and 34 above. Defendants are aware of and acquiesce in their agents engagement in the acts described in paragraphs 33 and 34 above.

In other words, a determination by the INS whether an applicant has a well-founded fear of persecution in El Salvador depends in part on an appraisal of the fairness of the governmental structure and process in El Salvador and in part on an examination of the applicant's unique situation. Appellants contend that, under present practice, the former will "routinely" outweigh the latter. Moreover, they argue that the State Department in its advisory opinions permits United States foreign policy goals to obfuscate appropriate recognition of El Salvador's defective human rights record.

Appellants also attack the Attorney General's refusal to suspend deportation proceedings against the entire class of Salvadoran nationals. They argue that prior practice regarding EVD has always made "humanitarian needs" the focus of the Attorney General's inquiry. In this case, they complain, the Attorney General has departed from precedent and relied primarily on matters of foreign relations and border control.

Local 25 asserts that it has Salvadoran members who have applied for and been denied asylum, but does not identify them (with the exception of the sole individual appellant, Mauro Hernandez, whose situation we later discuss); it further states that it has a number of members who wish asylum but have not yet applied. The Union claims defective asylum procedures deter those of its members who have not yet applied for asylum from doing so. Before the district court and the panel the Union argued that its members were injured because, as illegal immigrants in fear of deportation, they are inevitably subject to anxiety and are unfairly discouraged from taking part in high-profile activities in the United States, including active participation in union affairs. Such activities call attention to them and therefore make deportation more likely. The union deprived of the

---

1. It is unclear whether this regulation operates negatively to bar all reapplications outside deportation proceedings. If not, any rejected alien eligible to reapply would be in the same situation as one who had never applied.

benefit of those activities is also injured since fearful members erode the union's organizational strength. Before the *en banc* court appellants also assert that denial of asylum has immediate economic consequences. Asylum enables the asylee to apply for certain benefits and provides authorization for an employer to hire the otherwise undocumented alien under the recently passed Immigration Reform and Control Act of 1986.[2] The Union itself claims to be further injured by having members without asylum who cannot, under the 1986 Act, be rehired if they lose their current jobs; those members will not be active in the Union's activities.

After discovery, the district court granted both of the Government's motions for partial summary judgment, holding that the Attorney General's decision whether or not to interrupt deportation proceedings is an unreviewable exercise of prosecutorial discretion that also implicates foreign affairs, *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 594 F.Supp. 502, 505–10 (D.D.C.1984), and further ruling that the preparation of State Department advisory opinions was not shown to be tainted by ill-trained staff or the intrusion of foreign policy considerations, and that the use of the opinions by the INS was proper, *id.* at 510–14. An appeal followed, and a divided panel of this court approved the district court's grant of summary judgment on the EVD issue but reversed and remanded with respect to the challenge to asylum procedures, stating the district court had failed to articulate adequately its reasons for declining to permit further discovery before considering the motion for summary judgment. The full court then voted to rehear the case en banc, focusing on the question of standing, and therefore vacated the panel opinion.

II.

A.

Local 25 sues both in its representative capacity—it claims to have roughly 1,000 Salvadoran members—and in its own right. We first consider its standing to sue as a representative of its Salvadoran members who are illegal immigrants. Organizational standing is governed by the three-prong test of *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Supreme Court there summarized its prior holdings, stating that

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441. Since we conclude that no member of Local 25 could bring this suit as an individual, it is unnec-

---

**2.** Appellants suggest that a grant of asylum would make the recipient eligible for refugee assistance, 8 U.S.C. §§ 1521–1525, for state assistance, for permanent resident status in one year, 8 U.S.C. § 1159, and for hiring in the wake of the portion of the Immigration Reform and Control Act of 1986 forbidding the hiring of unauthorized aliens, 8 U.S.C. § 1324(a). In general, the legislative history of the Refugee Act of 1980 indicates Congress' intent to provide an opportunity for aliens to regularize their status as asylees *outside* the context of a deportation hearing. *See, e.g.,* S.Rep. No. 256, 96th Cong., 1st Sess. 9 (1979), U.S.Code Cong. & Admin.News 1980, p. 141. For purposes of this case, we treat this new argument as an amendment to the complaint. We are particularly willing to take this unusual step because of the intervening effect of the Immigration Reform and Control Act of 1986.

This concrete deprivation flowing from the denial of asylum, coupled with the possibility that asylum applications may be renewed only after the Government has affirmatively sought deportation, *see supra* note 1, leads us to assume without deciding that direct review of the denial of asylum may be had. If review were unavailable—as might be so were the only injury asserted expulsion from the country, a claim that would not be ripe until deportation proceedings were complete, *see Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 749–51 (D.C.Cir.1984)—we would of course dismiss the case immediately. *See Kashani v. Nelson,* 793 F.2d 818 (7th Cir.); *cert. denied,* — U.S. —, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986). Appellants ask nothing other than review of the district director's asylum decisions, albeit in collective rather than individual form.

essary for us to consider the second and third factors set forth in *Washington Apple.*

The question regarding Union members who have not applied for asylum—or who have applied but have not yet been denied —is whether an individual member would have standing to sue to challenge a "practice" that he asserts would likely govern his case and lead to denial if he should seek asylum. The word "practice" as used in appellants' complaint refers to the degree of emphasis placed on State Department advisory opinions concerning the political-legal situation in El Salvador in determining whether the individual applicant has a *well-founded* fear of persecution. It may well be that if we could conceive the issue appellants present as a self-contained question of law unrelated to the facts of an individual case—but which would determine such cases—an individual member, and thus the Union, could bring this suit. In *International Union, UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Supreme Court held that a union had standing in behalf of its members to challenge guidelines issued by the Secretary of Labor that bound state employment agencies' administration of the Trade Act of 1974. Although the statutory scheme contemplated that individuals would bring claims before the state employment agencies and appeal denials to the state courts, the union had standing in federal court to challenge the guidelines directly since undisputedly it had members who had "yet to receive either the TRA benefits they believe are due or a final state judgment that would preclude further consideration of their eligibility claims." *Id.* at 106 S.Ct. at 2530. In *International Union,* however, the union argued the Secretary's guidelines were inconsistent on their face with the Trade Act and federal veterans benefits statutes. The district court had noted "plaintiffs allege that the guidelines themselves are invalid; they do not contest the particulars of the application of the guide-lines to the facts of individual cases." *Id.* at 2527 (quoting *International Union, UAW v. Donovan,* 568 F.Supp. 1047, 1050 (D.D.C.1983). And, as the Supreme Court reasoned, if the union was correct, automatically a number of its members' claims would be affected. *Id.* at 2530.

Despite appellants' efforts to describe the case before us in similar terms, they cannot succeed. We think it apparent that in the absence of a particularized set of facts, it is impossible to evaluate appellants' claim. They do not point to any categorical infirmity in the Government's procedures. They do not, for example, contend that the State Department should, as a matter of law, play no role in advising the INS on the political situation in El Salvador, nor do they assert that all Salvadoran immigrants are denied asylum. Instead, appellants say the Government is guilty of misplaced emphasis, or even improper nuance; such a claim cannot, we think, be considered in the abstract. Thus, the complaint alleges that the INS relies "almost exclusively" on the State Department opinion and that the State Department "routinely" recommends against asylum. Appellants argue that the INS generally relies *too* heavily on the State Department and the State Department is *too* sympathetic to the Salvadoran government. But we do not understand the assertion to be directed to all cases, for some Salvadorans do receive asylum. This challenge is, according to appellants' own pleading, to a process of balancing several factors as applied to individual cases, and designating the Government's past behavior a "practice" does not convert this process into a categorical policy that can be examined unrelated to the facts or merits of an individual claim. The weight due the State Department opinion with respect to a particular application can be determined only in the context of that application—there is no statutory or regulatory formula to apply.[3]

**3.** After examining the complaint carefully, we cannot agree with Judge Mikva's characterization of this case as a pure legal challenge to the "guidelines" applied by the INS. Mikva op. at 1506. No such "guideline" is alleged. Instead, appellants' challenge is to INS practices as applied to individual requests for asylum.

With respect to any possible future application for asylum by a Salvadoran member of Local 25, we cannot now know whether that member will be injured by the "practice" against which the Union complains. We cannot say of any future case what emphasis will be placed on the State Department's advisory opinion or what emphasis would be proper. For that reason, the injury or threatened injury is too speculative to confer standing. *See Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983) ("The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' "); *see also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) ("unadorned speculation will not suffice to invoke the federal judicial power"). We think it impossible to conclude there is a real and immediate threat that any particular applicant would be denied asylum on grounds of which appellants complain. *See Harrington v. Bush*, 553 F.2d 190, 208–09 (D.C.Cir.1977) (denying standing to appellant Congressman to challenge alleged illegal use of funds by the CIA in part because the alleged harm "would take place, if at all, at some undetermined time in the future when Congress exercised" a power related to the alleged illegality); *see also International Longshoremen's Union, Local 37 v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954) (rejecting for failure to present a case or controversy a union's attempt to obtain an injunction prohibiting the INS from applying a statute in a situation that had not arisen at the time of suit).

Because the Union's claim cannot be adjudicated as framed, the recent case of *Haase v. Sessions*, 835 F.2d 902 (D.C.Cir. 1987), is inapposite. In *Haase*, a journalist alleged that on his return from Nicaragua he was illegally searched by FBI and Customs agents, and further alleged that this search was part of an official policy of harassing travellers returning from Nicaragua in order to gather intelligence. 835 F.2d at 904–05. We held that the complaint was not "logically defective," but that the accompanying factual allegations were deficient as they stood to survive a Rule 12(b)(1) motion to dismiss. 835 F.2d at 907–08. In the instant case, by contrast, no amount of factual buttressing can affect standing, for the flaw is logical. Local 25 seeks to prove a policy or "practice" of misuse of the advisory opinions—a tendency that could only be seen by examining the merits of individual cases [4]—yet it has failed to present even one case by which we could measure their contentions. *Haase* is thus immediately distinguishable by virtue of the presence of the aggrieved party, Haase, who was a victim of the alleged illegality. *See id.* at 908. And even in that case, the court noted that particularized accounts of many more such incidents would have to be placed on record before a broad attack on a government "policy" could be undertaken. *Id.* at 908–10.[5]

---

**4.** The problem is not just one of the "quantum of proof," as Judge Mikva's opinion suggests. Mikva op. at 1506. The Union's claim is that improper emphasis is given the advisory opinions, an allegation that can be examined only by first determining what the proper emphasis is, and that varies from case to case. As Judge Mikva puts it, "[i]t is simply not *possible* to examine the challenged 'practice' unrelated to facts." Mikva op. at 1507. The Union's presentation of its case without those facts, and its assertion those facts are *not needed*, are logically inconsistent with its claim that the INS has pursued an illegal practice.

**5.** Local 25 requests that, in the event we conclude that it lacks standing, the case be remanded to the district court to allow it to cure the constitutional defect. To the extent it seeks to develop further facts regarding the alleged "practice," however, the foregoing discussion demonstrates the futility of such activity. To be sure, we remanded in *Haase*, leaving open the possibility of further development regarding the policy, *id.* at 910, but that remand was necessary because the district court had erroneously treated the motion as one for summary judgment and allowed the defendant to attack the evidentiary sufficiency of the claims. *Haase v. Webster*, 608 F.Supp. 1227, 1229 n. 1 (D.D.C. 1985); *see Haase v. Sessions*, 835 F.2d at 907, 910. Such an attack can have no bearing on logical sufficiency.

There is also no reason at this late stage to remand to allow the Union to name individual

Local 25's claim can, in our view, also be described as constitutionally unripe. As has been aptly observed

[a]ll of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

*Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.) (Bork, J., concurring), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), *quoted in Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). We see this case at the intersection of constitutional standing and ripeness. Even were we to conclude that there is an immediate threat that an applicant would encounter the difficulties appellants allege, those difficulties are without adequate shape or form to permit us to judge the potential dispute. The claim on behalf of those who have not yet been denied asylum is not constitutionally ripe because it is not concrete enough to constitute a case or controversy.

To be sure, no court of which we are aware has yet articulated the boundaries between constitutional and prudential ripeness, although the distinction has been remarked on.

Ripeness law overlaps at its borders with Article III requirements of case or controversy. However, the primary focus of the ripeness doctrine as it concerns judicial review of agency action has been a prudential attempt to time

review in a way that balances the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.

*Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985) (footnotes omitted). *Compare Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974) ("issues of ripeness involve ... the existence of a live 'Case or Controversy' ") *and Ticor Title Ins. Co. v. FTC,* 814 F.2d 731, 745 n. 1 (D.C.Cir.1987) (separate opinion of Williams, J.) (ripeness doctrine is jurisdictional "in extreme cases") *with American Trucking Ass'ns v. ICC,* 747 F.2d 787, 789–91 (D.C.Cir.1984) (holding a case unripe because "whether or not constitutional limits are exceeded ... our own ability to decide intelligently, and our own confidence that we are expending our resources in resolving a dispute that has substance, are proximately affected"). Perhaps this line has not been carefully drawn because constitutional standing and ripeness are so interrelated that a constitutionally unripe case may often be analyzed in terms of standing. This case, for instance, embodies a clear overlap. Where an asserted injury is so speculative as to call standing into question, it may, as here, also involve assertions about future contingencies that make it unripe. *Cf. Babbitt v. United Farm Workers,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) ("The difference between an abstract question and a 'case or controversy' is one of degree, of

plaintiffs. The case is far advanced; it came to us on a grant of summary judgment, and there is no suggestion appellants were ever denied the opportunity to produce injured individuals. A lawsuit is not a continuing dialogue with the judiciary in which a plaintiff may offer a series of pleadings until one confers Article III jurisdiction on the court. *See Wilderness Soc'y v. Griles,* 824 F.2d 4, 16–17 (D.C.Cir.1987). We have, in effect, permitted appellants to amend their complaint at the en banc stage to allege that denial of asylum carries immediate eco-

nomic consequences, in part because of the intervening legislative change. We have therefore given them every chance to convince us that we have jurisdiction. Enough is enough. *See Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975) (complainant must allege facts sufficient to show standing). Of course, nothing prevents Local 25 or its members from bringing a new action in which the standing and ripeness difficulties we have identified are not present.

course, and is not discernible by any precise test.").

We think constitutional ripeness concerns are implicated, however, when the dispute is so shapeless that the court is necessarily called upon to hypothesize regarding not only the *facts* of the dispute, but the very "policy" or *rule* that is challenged; such is the very paradigm of an advisory opinion.[6] In *Babbitt*, for instance, the Supreme Court held not justiciable, as requiring a "patently advisory" opinion, a challenge to an Arizona law declaring that no employer would be required to furnish a union any facilities for the purpose of communication between the union and workers. The Court noted "it is conjectural to anticipate that access [to facilities] will be denied," but observed "[m]ore importantly, appellees' claim depends inextricably upon the attributes of the situs involved." (That is, whether it is like the company town in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).) *Babbitt*, 442 U.S. at 303–04, 99 S.Ct. at 2311–12; *cf. Warth*, 422 U.S. at 516, 95 S.Ct. at 2214 (Home Builders' claim unripe where it has

failed to identify a project from which members were precluded). The advisory nature of any opinion we might issue here is even more apparent. Appellants ask us, beyond anticipating the denial of asylum, to imagine the precise reasons for and circumstances surrounding that denial.[7] Without specific facts before us that would allow us to gauge the appropriateness of the Government's behavior, the most we could do would be to command the various government parties to obey the law, a function we could perform equally well without the need for parties, briefs, and argument. *See Hodel v. Virginia Surface Mining Reclamation Ass'n*, 452 U.S. 264, 294 n. 36, 101 S.Ct. 2352, 2369 n. 36, 69 L.Ed.2d 1 (1981); *United Pub. Workers v. Mitchell*, 330 U.S. 75, 86–91, 67 S.Ct. 556, 562–65, 91 L.Ed. 754 (1947) (refusing to issue an "advisory opinion" in a challenge to the Hatch Act by government employees who failed to allege they had violated that law).[8] No striking of the balance of prudential factors can alter Local 25's failure to present an Article III case or controversy.[9]

**6.** Judge Mikva suggests that our concern is the court's institutional capacity, not its constitutional power. Mikva op. at 1504. This is somewhat of a misunderstanding. Our institutional limitations are, after all, constitutionally based. We are *constitutionally forbidden* to opine on abstract disputes over, for instance, the probable future implementation of asylum policy. "Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution." *Schlesinger v. Reservists Committee To Stop the War*, 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2931–32, 41 L.Ed.2d 706 (1974). This proscription also tends to allay fears about our competence, since it defines our role rather tightly, but it is not a restriction we may waive when we feel we have a particularly good grasp of a problem.

**7.** Review here would thus be a far cry from the pre-enforcement review countenanced in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which involved a clear legal rule. *Id.* at 149–52, 87 S.Ct. at 1515–17.

**8.** In an opinion ordering dismissal of a claim for failure to present a "case of actual controversy" sufficient to allow declaratory judgment, Judge Ruth B. Ginsburg, who takes no part in this decision, put this point well:

[O]ur federal court system traditionally sets precedent not in response to "pure" questions framed for or referred to federal judicial tribunals, but in the process of deciding fact specific, particular cases. We have in this instance no warrant to permit plaintiffs to avoid the ordinary mode of gaining access to federal courts.

*National Ass'n of Rehabilitation Facilities v. Bowen*, 840 F.2d 931, 934 (D.C.Cir.1988).

**9.** Even if the Union's claim presented no constitutional problem of standing or ripeness, it would probably fail the test for prudential ripeness, for "[w]e believe that judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). If only prudential ripeness were at stake in this case we would have to consider "the hardship to the parties of withholding court consideration," *Abbott*, 387 U.S. at 149, 87 S.Ct. at 1515, but as the next paragraph of the text indicates, we do not believe that the major hardship, uncertainty as to whether applying for asylum is a better strategy than remaining anonymous, is one to which we can give cognizance.

One might wonder why appellants seem so reluctant to bring actual cases (other than Hernandez') to the federal courts. At oral argument we gained the impression that the Union's unwillingness to litigate individual cases stems from its members' reluctance to call attention to themselves. Aliens who have illegally entered the country are, of course, subject to deportation if properly [10] denied asylum. It is understandable that those who have not yet applied for asylum feel they assume some risk in applying. But that risk is inherent in Congress' provision for asylum; individuals must identify themselves in order to invoke these procedures.[11] Surely it cannot be argued that an alien who has violated American law by securing illegal entry has a legally protected interest in remaining undetected. *Cf. Burrafato v. United States Dep't of State,* 523 F.2d 554, 557 (2d Cir.1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976) (it would encourage surreptitious entry into the country to give an illegal alien rights greater than those he would have enjoyed had he not entered the country); 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.4 at 420 (1984) (suggesting a smuggler would not have standing to protest customs procedures on the basis of

harm to his interest in smuggling). Of course an immigrant who enters the United States illegally does not engage in a typical criminal act, but we cannot ignore that illegal entry violates the law. And on appellants' logic, a fugitive from law enforcement agencies could seek a hypothetical trial of his case before surrendering to their custody. The "harm" of being forced to invoke the asylum provisions before challenging their administration is in any event not a basis for us to ignore the constitutional limitations on our jurisdiction and the insuperable difficulties we would face in trying to consider this claim in the abstract.[12] This issue would not be justiciable if put forward in this manner by an individual Union member, so we will not consider it merely because it is urged by the Union as a representative. *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211.

Local 25, it is true, also claims that some of its members have applied for asylum and been improperly denied, but on appeal it does not identify these cases, with the exception of Hernandez'; it claims it is not required to do so. We agree it is likely that a denial of asylum is appealable under the APA,[13] so that we could review such denials if properly presented, but we fail to

---

**10.** Still, if asylum is improperly denied, judicial review will, we assume, be available to correct the error and remove the risk.

**11.** The Refugee Act of 1980 responded primarily to the influx of refugees from Southeast Asia in the mid to late 1970s. *See* H.R.REP. No. 608, 96th Cong., 1st Sess. 5–6 (1979) (accompanying H.R. 2816, later replaced by S. 643). The debate focused almost exclusively on policies regarding the admission of refugees into this country, and that setting entailed a two-fold presumption—that seekers of refugee status would be excluded from the United States unless that status were affirmatively granted and that this grant would have to be actively sought by the refugees. Remarks by Senator Kennedy, the main Senate sponsor of the bill, show that asylum for those already in this country was viewed as a special case of the general problem of refuge for all foreign nationals. Senator Kennedy said the Attorney General should promulgate regulations to ensure that applicants for asylum were treated in accord with the spirit of the Act—which was, again, devoted almost entirely to the subject of external refugees. 126 CONG.REC. 3757 (1980); *see also* S.REP. No. 256, 96th Cong., 1st

Sess. 9 (1979) (intent was to give asylees conditional admission status comparable to that afforded refugees). It is implicit throughout the debate and an item of common sense that an applicant must make himself known in order to seek asylum, and there is nowhere a suggestion that the fact of the application was intended by Congress to be confidential.

**12.** Judge Mikva's opinion at 1508 envisions an *in camera* examination of the particulars of such cases as are put forward, presumably in order to avoid this harm of identification. Such a procedure might be appropriate (assuming *arguendo* there is a legitimate interest in anonymity) if the Union had actually brought a class-action type claim centered on the wrongs done particular individuals. But the Union is trying to challenge INS practices in general, and claims it does not need to present particular cases.

**13.** *See supra* note 2; *cf. INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1210, 94 L.Ed.2d 434 (1987) (challenge to asylum determination but not to finding of deportability in deportation proceedings).

understand how we can examine actual denials of asylum without the facts of the case any more than we can consider a hypothetical future denial of asylum. In either event, our capacity to analyze and discern a legal error is, by the nature of appellants' claim, necessarily tied to specific facts.[14]

Local 25 also sues in its own capacity, but the injury it asserts is wholly derivative of its members' injury. It claims that its organizational strength is impaired because of its members' apprehension, which in turn flows from their tenuous status and the allegedly defective asylum procedures. It thus criticizes the same "practices," and we are no more able to entertain a hypothetical case in behalf of the Union than we would be in behalf of one of its members. The Union's case for itself thus stands on no "surer footing" than its representative claim.

### III.

We turn to Mauro Hernandez' claim. His position has undergone several shifts in the course of this litigation. When Hernandez intervened in Local 25's suit, his application for asylum was pending. Some months later, on January 31, 1984, the INS district director approved the application. Unfortunately for Hernandez, however, his deposition testimony in this proceeding cast doubt on the bona fides of his asylum application. His fear of persecution in El Salvador was based on his alleged activity as a trade unionist in that country. But after his deposition, the State Department discovered that the trade union in which he claimed to have been active just before emigrating to the United States had been defunct since 1968. BHRHA then notified the INS district director that Hernandez had not established a well-founded fear of persecution. On May 11, 1984 the INS informed Hernandez of its intent to *revoke* his asylum, giving him fifteen days to examine and rebut the evidence. *See* 8 C.F.R. § 208.15(b). Hernandez did not respond at all and his asylum was consequently revoked.[15]

Paradoxically then, Hernandez' asylum was revoked because he received exactly the treatment the complaint prays for—careful consideration of the merits of his particular case—and he does not challenge the reasons given for denial of his application. It is thus apparent that Hernandez' injury is not "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

### IV.

The Attorney General has declined to grant extended voluntary departure status to Salvadoran nationals. *See* Letter from Attorney General William French Smith to Congressman Lawrence J. Smith (July 19, 1983), *reprinted in* Joint Appendix tab 18. Appellants ask us to review the Attorney General's decision to determine whether he has departed from a settled pattern of basing EVD decisions on humanitarian factors.

We need not inquire into the array of factors the Attorney General considered in refusing to confer EVD status, for we are without power to order modification of that decision. The extrastatutory decision to withhold enforcement is an exercise of the Executive Branch's discretion to decide whether to prosecute a case that flows from the Constitution's admonition that that Branch "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3; *see also United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2203–04, 60 L.Ed.2d 755 (1979); *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). In *Heckler v. Chaney*, 470 U.S. 821, 828–33, 105 S.Ct. 1649, 1654–57, 84 L.Ed.2d 714 (1985), the Supreme Court held that, absent statutory

14. Thus, we do not, as Judge Mikva's opinion at 1502 suggests, fail to credit the Union's allegations. Crediting those general allegations would not help us decide this lawsuit since claims of improper emphasis on the BHRHA opinions must be supported by descriptions of particular circumstances.

15. These facts were not fully presented to the panel.

language that would provide the reviewing court with a "meaningful standard against which to judge the agency's exercise of discretion," *id.* at 830, 105 S.Ct. at 1655, the decision to refuse to take enforcement action is presumed unreviewable under 5 U.S.C. § 701(a)(2) as having been committed to the agency's discretion.[16]

After describing administrative factors, such as expertise and the necessity of allocating scarce resources, that counsel against review of any enforcement decision, *id.* at 831–32, 105 S.Ct. at 1655–56, the Court drew a distinction between decisions not to take enforcement action and decisions to enforce that has particular bearing on the case before us:

> [W]e note that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner.

*Id.* at 832, 105 S.Ct. at 1656. We see no relevant distinction between a refusal to suspend enforcement over a broad category of cases and one declining enforcement. Concerns regarding review of the Attorney General's judgments with respect to resource allocation are of course present in either case, and the withholding of EVD status differs from an enforcement action in that it unleashes no "coercive power on an individual's liberty or property rights" and does not involve an exercise of power that would provide "a focus for judicial review." Such a decision implicates only the kinds of policy choices and allocations left to the Executive Branch and none of the individual rights and concerns that make judicial review desirable and possible.

Prosecutorial discretion with respect to EVD is particularly insulated from review because it involves considerations of foreign relations. Control of the country's policy toward aliens is "inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–90, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952). "Matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984) (quoting *Harisiades*, 342 U.S. at 589, 72 S.Ct. at 519).[17] This court certainly could not undertake to review a decision with such a significant foreign policy component in the absence of an extraordinarily precise statutory standard against which to measure the conduct in question. *See Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976) ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." (footnote omitted)). Because there is none, and for the other reasons set forth in this opinion, we would affirm the judgment of the district court.

---

**16.** The extrastatutory nature of the EVD determination distinguishes it from the asylum determination, which applies the statutory definition of refugee, and from cases such as *Sang Seup Shin v. INS*, 750 F.2d 122 (D.C.Cir.1984), where a final order in a statutory deportation proceeding was held to be reviewable under 8 U.S.C. § 1105a(a) (1982).

**17.** Indeed, the political branches have been active. At this writing, an Act is pending in the Senate that would direct the Attorney General to suspend deportation of Salvadoran nationals, among others. H.R. 618, 100th Cong. 1st Sess. §§ 301–303, U.S.Code Cong. & Admin.News 1986, p. 1812; *see* H.R.Rep. No. 212, 100th Cong., 1st Sess. pts. 1 & 2 (1987).