UNITED STATES of America, Appellee,

v.

Joseph WATSON, Appellant.

UNITED STATES of America, Appellee,

v.

Tracy WATSON, Appellant.

Nos. 91–1414, 91–1420.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1991.
Decided Dec. 17, 1991.

Timothy J. Farrell, O'Fallon, Mo., argued, for appellant, Tracy Watson.

R. Thomas Day, Asst. Federal Public Defender, St. Louis, Mo., argued, for appellant, Joseph Watson.

Howard J. Marcus, Asst. U.S. Atty., St. Louis, Mo., argued for appellee.

Before BOWMAN, Circuit Judge, ROSS, Senior Circuit Judge, and LOKEN, Circuit Judge.

BOWMAN, Circuit Judge.

These appeals follow the convictions of Tracy and Joseph Watson for drug trafficking and conspiracy. A jury convicted Tracy of one count of conspiring to possess cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 846 (1988); Tracy also was found guilty of nine counts of distributing cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1). Joseph was convicted of the same conspiracy charge and found guilty of six counts of distributing cocaine and cocaine base. The brothers claim the District Court[1] erroneously refused to compel the prosecutor to testify about prior conversations with the government's witness; they also claim that the introduction of an informant's hearsay statements violated their rights under the Sixth Amendment to the federal Constitution. Tracy Watson also asks us to review the sufficiency of the evidence presented against him and to correct an alleged error in his sentence. We affirm.

I

The St. Louis police began to investigate the activities of Tracy and Joseph after an informant claimed they were selling drugs from some local apartments. In April 1990, Detective Richie Williams resolved to visit that area equipped with a concealed radio transmitter whose signals were to be

1. The Honorable George F. Gunn, Jr., United States District Judge for the Eastern District of Missouri.

recorded in a nearby surveillance vehicle. Williams employed this apparatus to record all the transactions he made with the defendants over the following two months. He first went to the locality on April 19, 1990. When he arrived, an unidentified man approached him and asked if he wanted to buy cocaine. Williams said he did and asked after "Tracy." The unidentified man then summoned Tracy Watson, who instructed Williams to park his vehicle. Once this had been done, Tracy entered the vehicle and displayed what Williams later recalled was a "clear bag that contained a very large amount of off-white chunks," which Williams "believed to be [cocaine base]." Trial Transcript (hereinafter "Tr.") at 16. Williams purchased five pieces for $100.

When the Detective returned on April 23, Tracy said he was out of cocaine but that he would soon have additional merchandise. Williams returned an hour later. Upon seeing him, an unidentified man went inside a nearby apartment and emerged with instructions for Williams to enter. Williams complied, and upon entering met Tracy. After discussing the provenance of cocaine and its price, Williams bought ten pieces of cocaine base from Tracy for $200. Five days later, Williams and Tracy discussed future drug deals and the detective spent $200 to purchase another nine pieces of cocaine base.

On April 26, 1990, Williams met Tracy in one of the apartments and offered to buy twenty pieces of cocaine base. From under a chair cushion, Tracy removed a plastic bag containing cocaine and directed Williams to follow him into the rear bedroom. Once inside, Tracy removed the bag's contents and discovered he did not have the amount Williams wanted. According to Williams, Tracy "then called for his brother to bring him more cocaine." Joseph entered the room and removed a bag from his pocket, and Tracy told him to close the door. Tracy took eight pieces of cocaine base from his own bag, and Joseph removed twelve from the bag he had brought into the room. Williams then gave Tracy $400, which the defendant split between himself and Joseph.

Williams returned to the area on the following afternoon and was approached by an unidentified male who asked if he had come to buy cocaine. When Williams said he had, this person called for Tracy, who sold Williams sixteen pieces of cocaine base for $360. Tracy also gave Williams an additional piece free of charge; as Williams later recalled, this was "for being a good customer." Tr. at 42. During this transaction Williams talked to Tracy about buying a large amount of cocaine.

On April 30 Williams saw Tracy outside one apartment with a group of men, one of whom hailed the Detective as "the $400 man." Tr. at 46. Tracy proclaimed to all present that he knew who his regular customers were and invited Williams into the apartment. Once inside, Tracy said he had been unable to get a large amount of cocaine, but that he could probably acquire it by the week's end. Williams told Tracy he intended to sell cocaine in Springfield because it was a good market. Tracy said he had heard the same thing about Springfield: "My partner be down there. He was tellin' me 'bout that." Government's Exhibit 6. Williams bought twenty pieces of cocaine base from Tracy for $400. During this transaction Tracy said he would be leaving St. Louis to obtain more cocaine in preparation for the first of the month, because he could earn approximately $12,000 on the day welfare checks were issued.

On May 2, 1990, Tracy told Williams that he was not selling cocaine anymore, but sent the Detective to Joseph as a possible supplier. Williams offered to buy an ounce of cocaine from Joseph, who said he would try to obtain that amount. Joseph then agreed to sell Williams twenty pieces of cocaine base for $400 and to give Williams one free portion. Upon finding he only had nineteen pieces, Joseph instructed a man named "Tim Tim" to watch the cocaine while he left the room. Joseph returned with a bag containing approximately thirty pieces of cocaine base, two of which he selected to make up the amount.

On May 4, 1990, Williams was directed to Joseph by a minor. Williams met with

Joseph, Tracy, and a third person. Tracy repeated that he was not selling cocaine anymore, but again referred Williams to his brother. Joseph ultimately sold Williams thirty-three pieces of cocaine base for $660. During this time the Detective and Joseph discussed the possible sale of an ounce of cocaine, and discussed the lookouts Joseph used to safeguard his business.

When Williams returned on May 8, 1990, an unidentified man told him Joseph was not selling cocaine base, but that he was selling powdered cocaine. When Williams spoke with Joseph, the defendant said his supplier would not agree to provide an ounce of cocaine. Williams bought seventeen bags of powdered cocaine. Ten bags were supplied by Joseph, and Tracy provided seven bags to complete the amount. Williams then paid Joseph $850.

On May 9, 1990, Williams again spoke to Joseph about buying an ounce of cocaine. Joseph said he did not think he could provide this amount, but that he would try. Joseph offered to sell Williams seventeen bags of powdered cocaine at $50 each, and to provide two free bags. When Williams agreed, Joseph left and entered a nearby apartment. A short time later, Tracy emerged from this apartment and told Williams to enter another apartment. Once inside, Tracy began to measure powdered cocaine into plastic bags. When Williams said Joseph had promised two free bags, Tracy replied he already knew about the sale arrangements. Joseph then came into the apartment, counted out nineteen bags, and gave them to the Detective. Williams then gave Joseph $850.

Williams returned to the apartments on May 11, 1990. Joseph told the Detective he was out of drugs, but urged Williams to come again after Joseph had spoken to his supplier. Joseph, however, was not there when Williams returned; Williams spoke with Tracy, who said he also was waiting for Joseph. Tracy said, "[W]e ain't got shit" and asked Williams to return later. Government's Exhibit 11. When Williams came back, Tracy told him that Joseph was still absent. In conversation with the Detective, Tracy agreed he and others had been turning away business and said, "we can lose about two or three thousand dollars." *Id.* Williams left without making a purchase.

Four days later Tracy told Williams that they had $8,000 worth of cocaine left to sell and were down to their last eighteen bags of the drug. When Williams said he needed to buy at least fifty bags of cocaine, Tracy told him to come back later that day. When Williams returned and knocked on an apartment door, Tracy came outside. Joseph joined them and the three began a conversation during which Joseph told Williams he had $500 worth of cocaine to sell. When Williams agreed to buy it, Joseph took a package from his pocket and handed it to Tracy. The three entered the apartment and went into a bedroom, where Tracy removed eleven smaller packages from the one Joseph had given him. Joseph told Williams his supplier would not sell an ounce of cocaine, and added that Joseph was trying to buy it from another source and turn it into cocaine base. Tracy then gave Williams ten packets of cocaine, for which the Detective gave Tracy $500.

Williams's last cocaine purchase was made in the afternoon of May 30, 1990. Williams went to the complex and spoke to Tracy. During the conversation, one of Tracy's relatives took him aside and claimed that Williams was a police officer. When confronted with this statement the Detective, although he had previously arrested the relative, denied it. Apparently, Williams was believed: he then purchased thirteen pieces of crack from both men for $200, which he gave to Tracy.

II

■ The first issue arises from an incongruity between the opening argument of the Assistant United States Attorney (AUSA) and part of Williams's testimony. The AUSA told the jury, "[T]he police have a narcotics investigation ... in response to an informant's information that a Tracey [*sic*] Watson is selling crack at that location." Tr. at 5. Williams, at the outset of his testimony, testified about how his investigation began: "[A confidential] infor-

mant advised me that heavy cocaine sales was [sic] occurring at that address with brothers being involved, one Tracey [sic] Watson and Joseph Watson." Id. at 13. On cross-examination, Williams insisted he told the AUSA that the informant had named both brothers. Because the AUSA had not mentioned Joseph Watson in his opening statement, defendants moved to call the AUSA as a witness for the purpose of impeaching Williams. The brothers argue that the District Court's denial of their motion erroneously deprived them of critical evidence that would have damaged Williams's credibility.

■ Whether a defending or prosecuting attorney may testify in a case he is trying is within the discretion of the district court. United States v. Buckhanon, 505 F.2d 1079, 1084 (8th Cir.1974); Gajewski v. United States, 321 F.2d 261, 268 (8th Cir. 1963), cert. denied, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964). Requests for such testimony are disfavored. United States v. Prantil, 764 F.2d 548, 551 (9th Cir.1985); United States v. Dupuy, 760 F.2d 1492, 1498 (9th Cir.1985). The party seeking such testimony must demonstrate that the evidence is vital to his case, and that his inability to present the same or similar facts from another source creates a compelling need for the testimony. See Gajewski, 321 F.2d at 269 (defendant must show prosecutor "possesses information vital to the defense"); Prantil, 764 F.2d at 551 ("a defendant has an obligation to exhaust other available sources of evidence before a court should sustain [his] efforts to call a participating prosecutor as a witness"); United States v. Tamura, 694 F.2d 591, 601 (9th Cir.1982) (movant must demonstrate a "compelling need" for opposing counsel's testimony). The District Court's ruling on such a motion will not be reversed " 'absent a clear and prejudicial abuse of discretion.' " United States Envtl. Protection Agency v. City of Green Forest, Ark., 921 F.2d 1394, 1409 (8th Cir. 1990) (quoting Wade v. Haynes, 663 F.2d

778, 783 (8th Cir.1981), aff'd. sub nom. Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)), cert. denied, —— U.S. ——, 112 S.Ct. 414, 116 L.Ed.2d 435 (U.S.1991).

The AUSA's testimony was not vital evidence. Defendants argue that because neither Williams's tape recordings nor his police report mention Joseph, the Detective's testimony "raised" a "suspicion" that his attribution of Joseph's name to the informant's tip was an impromptu alteration of the evidence. Brief of Tracy Watson at 13, Brief of Joseph Watson at 8. However, defendants' offer of proof showed only that while Williams and the AUSA had many conversations about the brothers, the AUSA could not recall if Williams said the informant also had mentioned Joseph. This testimony would not have contradicted Williams and would not have given the jury additional facts with which to evaluate the Detective's credibility. In these circumstances, we do not believe the AUSA's stated lapse of memory was vital evidence. Compare Prantil, 764 F.2d at 551 (reversing exclusion of testimony by a prosecuting attorney who "was a witness to, and indeed a participant in, some aspect of all of the events alleged in the indictment") with Dupuy, 760 F.2d at 1497–98 (upholding exclusion of prosecutor's testimony about her notes of informant's debriefing because, inter alia, prosecutor could not remember recording the informant's contradictory statements).

In addition, we note the District Court's ruling actually left the brothers in a position superior to the one they sought to obtain by the AUSA's testimony. Without an explanation that the incongruity between Williams's testimony and the opening argument may well have been produced by the AUSA's forgetfulness, the brothers were in a more effective position to employ this difference to attack Williams, as Joseph's counsel did during his closing argument.[2] Perhaps because Williams's attri-

---

**2.** Counsel argued that Williams "put in the police report yes, we went out there. The reason; an informer told him there was a Tracey [sic] Watson out there selling drugs. That's in the police report, in a taped monologue.... Sometimes what you say in these opening statements can embarrass you. I think this is an excellent example in [the AUSA's] opening statement....

bution of Tracy's name to the informant's tip was undisputed, Tracy's attorney did not dwell upon this matter. Tracy, however, had the same opportunity to suggest Williams manufactured evidence against his brother and was therefore capable of doing so against himself. The District Court did not commit a " 'clear and prejudicial abuse of discretion,' " and we find no error on this point. *Green Forest,* 921 F.2d at 1409 (quoting *Wade,* 663 F.2d at 783).

*United States v. Azure,* 845 F.2d 1503 (8th Cir.1988): Azure did not suggest the case against him was being manufactured by law enforcement personnel, thereby placing their honesty in issue and rendering the reasonableness of their investigations relevant. *Id.* at 1506–07. It was not a " 'clear and prejudicial abuse of discretion' " for the District Court to admit this part of Detective Williams's testimony. *Green Forest,* 921 F.2d at 1409 (quoting *Wade,* 663 F.2d at 783).

### III

■ Defendants also claim the District Court erred in permitting Detective Williams to testify about the informant's tip. They contend this testimony contained "a hearsay accusation" that violated their right to confront the witnesses against them. Brief of Joseph Watson at 10; Brief of Tracy Watson at 15.[3] It is elementary that "[a]n out-of-court statement is not hearsay, however, if it is offered for the limited purpose of explaining why a police investigation was undertaken." *United States v. Brown,* 923 F.2d 109, 111 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 110, 116 L.Ed.2d 80 (1991). Detective Williams's testimony was offered for this purpose and both the government and the District Court expressed this understanding before the jury. Although the brothers insist the reasons behind the investigation were not in issue, their defense relied extensively on the claim that Detective Williams was fabricating or distorting the evidence against them. Therefore we disagree with the defendants' claim that Williams's testimony is like the victim's hearsay accusation erroneously admitted in

### IV

■ Tracy contends the evidence was insufficient to convict him. In evaluating this claim "we must assume that the government's evidence is truthful and valid, and we must give the government the benefit of all reasonable inferences which may logically be drawn from that evidence." *United States v. Warbonnet,* 750 F.2d 698, 700 (8th Cir.1984) (per curiam). The evidence need not be so powerful as to exclude every reasonable hypothesis of innocence, *United States v. Newton,* 756 F.2d 53, 54 (8th Cir.1985), or to prove guilt beyond all possible doubt. *Rothgeb v. United States,* 789 F.2d 647, 650 (8th Cir. 1986). The record need only contain "substantial evidence," *id.,* from which a jury could conclude, beyond a reasonable doubt, that the defendant is guilty. *United States v. Meyer,* 906 F.2d 1247, 1252 (8th Cir.1990). "We will not lightly overturn the jury's finding of guilt," *id.,* and may reverse only upon a demonstration that a rational jury would have had no choice but reasonably to doubt the existence of an element of a charged crime. *United States v. Jones,* 880 F.2d 55, 64 (8th Cir.1989);

Now, here much later we have a statement that, well, there was evidence that the Watson brothers, Tracey [*sic*] and Joseph were out there selling dope. Now, I think Mr. Williams was asked a simple question, based on the opening statement, based on the police reports, based on a taped monologue, Officer Williams before yesterday, did you ever tell [the AUSA] that you had one iota of information or that anybody had claimed that Joseph Watson was out there selling narcotics? Well, I had to ask the question twice, if you'll recall, because there was some hemming and hawing around, a real vague answer the first time. And well, the sec-

ond time around he says well, I told him. Well, we'll see what [the AUSA] has to say about this in his closing argument." Tr. at 204–06.

**3.** Tracy Watson did not interpose a contemporaneous objection to this testimony, and was therefore open to an argument that he waived this claim of error. *United States v. Kragness,* 830 F.2d 842, 868 (8th Cir.1987); Fed.R.Evid. 103(a)(1). Because the government has not raised this point, we will address the issue as to both defendants.

*United States v. Powell,* 853 F.2d 601, 604 (8th Cir.1988).

Regarding the conspiracy conviction, 21 U.S.C. § 846 does not require the government to prove that Tracy acted in furtherance of a conspiracy. The evidence must only show that he "entered into an agreement with at least one other person and that the agreement had as its objective a violation of the law." *United States v. Foote,* 898 F.2d 659, 663 (8th Cir.), *cert. denied* — U.S. ——, ——, 111 S.Ct. 112, 342, 112 L.Ed.2d 81, 307 (1990); *see also United States v. Covos,* 872 F.2d 805, 810 (8th Cir.), *cert. denied,* 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). This agreement need not have been expressed; the evidence need show "no more than a tacit understanding among the participants." *United States v. American Grain & Related Indus.,* 763 F.2d 312, 315 (8th Cir.1985).

Viewed in the light most favorable to the jury's decision, the evidence shows that Tracy and Joseph twice pooled their cocaine in order to meet Williams's requirements. On one of these occasions Williams handed the entire purchase price to Joseph. After the other sale Williams gave the money to Tracy, who then divided it with Joseph. On two other occasions Tracy referred Williams to his brother for cocaine sales. During the discussion Tracy had with Williams on April 30 about selling drugs in Springfield, the defendant referred to a "partner." Indeed, Tracy repeatedly used plural pronouns when discussing cocaine sales with the Detective. For example, on May 11 Tracy told Williams he was waiting for Joseph (who had left to obtain cocaine) and said "we can lose about two or three thousand dollars." Government's Exhibit 11. On two other occasions Tracy personally executed drug sales that Williams had arranged with Joseph, and during one of these sales Tracy indicated Joseph had instructed him to give Williams free cocaine. This evidence is more than sufficient to sustain Tracy's conspiracy conviction. *See, e.g., Foote,* 898 F.2d at 663–64 (finding sufficient evidence for a section 846 violation when, *inter alia,* the defendant directed a detective to the location of a sale and

participated in transactions); *United States v. Reeves,* 730 F.2d 1189, 1195 (8th Cir.1984) (holding defendants' division of money used to purchase drugs under an agreement made with one defendant is evidence of a conspiracy); *United States v. Barker,* 806 F.2d 787, 788 (8th Cir.1986) (upholding conviction for conspiring to import cocaine; evidence showed that defendant rented the post office box where he received a package containing cocaine, and that he conferred with persons who acted suspiciously when the post office asked for further information about the box rental).

■ As to the possession charges, Tracy concedes that Williams's testimony provides evidence of guilt. But he claims no reasonable trier of fact could have relied on Williams's statements. Although ordinarily witness credibility is left completely to the jury and is beyond appellate review, *United States v. Brown,* 921 F.2d 785, 792 (8th Cir.1990), we must reverse a conviction if no reasonable person could believe the incriminating testimony. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 318, 319, 99 S.Ct. 2781, 2788, 2789, 61 L.Ed.2d 560 (1979) (holding evidence of guilt must be sufficient to "reasonably support a finding of guilt" in the mind of a "rational trier of fact"); *United States v. Gafyczk,* 847 F.2d 685, 694 (11th Cir.1988) (stating that conviction could be overturned if the evidence was " 'so incredible, so contrary to the teachings of human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt' ") (quoting *Wilcox v. Ford,* 813 F.2d 1140, 1146 (11th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987)); *cf. United States v. Drews,* 877 F.2d 10, 13 (8th Cir.1989) (holding the testimony of an accomplice "is sufficient to support a conviction when it is not incredible or insubstantial on its face").

Tracy begins his argument by stating that "the bulk" of Williams's testimony "concerned the nature and content of the taped conversations." Brief of Tracy Watson at 8. He claims Williams admitted that he may not have listened to the tapes of

this extended drug investigation until he transcribed them months later, and argues this fact provides ample reason to doubt Williams's testimony. Elsewhere in his brief Tracy notes that although Williams testified about Tracy's participation in several drug deals, Williams did not testify that the defendant's voice was recorded by the tapes of those deals. Tracy further points out the police did not attempt to determine whether his fingerprints were on the packages of drugs Williams received; that none of the other officers working with Williams was called to testify about the transactions; that no photographs were taken of Tracy at the apartment complex; and that although Williams supplied the brothers with money whose serial numbers had been recorded, none of these bills was recovered. Tracy concludes his convictions should be reversed because these alleged implausibilities, contradictions, and lack of corroborating evidence would give "the reasonable trier of fact a reason to doubt" his guilt. Brief of Tracy Watson at 9.

These arguments do not withstand scrutiny. Detective Williams was not a scribe testifying about the contents of records. He was a participant in the relevant events and spoke from his personal knowledge about each and every transaction. Tracy's claim that Williams testified he may not have listened to the tapes for months after they were made is astonishing: on cross-examination, Williams told Tracy's counsel that when he finished each purchase, he listened to the tapes of the transaction. Tr. at 120. Indeed, the tapes were merely corroborating evidence and although parts of them are indistinct (because of static, low voices, street noise and background music), they contain many audible, incriminating statements. The transcriptions, which were offered merely as interpretive aids, are accurate and duly note these indistinguishable sections. The mere fact that the machines employed by the police did not record Tracy's voice during several transactions would not compel any rational jury to disbelieve Williams's testimony that Tracy participated in them. Likewise, the absence of corroborating physical evidence such as fingerprints or photographs does not make a witness's testimony inherently unbelievable. *Cf. United States v. Sanders*, 547 F.2d 1037, 1040 (8th Cir.1976), *cert. denied*, 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977); *United States v. Jones*, 486 F.2d 476, 479 (8th Cir.1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1415, 39 L.Ed.2d 472 (1974) (both stating uncorroborated testimony of a single witness may support a conviction).

While it may have been possible for a rational jury to have disbelieved Detective Williams's testimony and thus to have acquitted Tracy, *Jackson* does not demand that the government's evidence be so conclusive and unimpeachable that no reasonable person could have rejected it; the case only prohibits reliance on evidence so untrustworthy that no rational person could have believed it. *Jackson*, 443 U.S. at 317, 318, 99 S.Ct. at 2788 (stating that a jury "may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt" and "when such a conviction occurs ... it cannot constitutionally stand"). Although Tracy's contentions are appropriate to an opening or closing argument to a jury, they do nothing to convince us that his convictions are invalid for want of evidence.

## V

■ Finally, Tracy argues the District Court erroneously concluded that his criminal history placed him in Sentencing Guidelines Category IV. The relevant facts are undisputed. On August 26, 1987, Tracy was convicted of theft in the St. Louis County Circuit Court and was placed on probation; his probation was revoked in August 1989, at which time he received a three-year sentence. Approximately two months later, in October 1989, Tracy pleaded guilty to possession of cocaine in the St. Louis City Circuit Court and received a two-year sentence; this sentence was ordered to run concurrently with the sentence for Tracy's theft conviction. Tracy agrees he deserves three criminal history points for his theft sentence, but challenges receiving three additional points for his cocaine sentence. He argues that since

the cocaine sentence was made concurrent with the theft sentence, both sentences were imposed in "related cases" under Guidelines section 4A1.2(a)(2), which requires sentences in such cases to be treated as only one sentence when computing a defendant's criminal history score. U.S.S.G. § 4A1.2(a)(2) (Nov.1990).

Application Note 3 to section 4A1.2 instructs that "[c]ases are considered related if they (1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing." U.S.S.G. § 4A1.2, comment. (n. 3) (Nov.1990); see also U.S.S.G. § 1B1.7 (Nov.1990) (indicating that commentary "may interpret the guideline or explain how it is to be applied"). Tracy's theft and cocaine offenses were not committed on a single occasion, nor is there evidence suggesting they were part of a common scheme or plan. The only possible way to consider them "related cases" is to accept Tracy's contention that they "were consolidated for trial or sentencing." U.S.S.G. § 4A1.2, comment. (n. 3) (Nov.1990). The District Court's decision regarding the legal interpretation of section 4A1.2(a)(2) is reviewed de novo. United States v. West, 942 F.2d 528, 530 (8th Cir.1991); United States v. Werlinger, 894 F.2d 1015, 1016 (8th Cir.1990).

██ The circumstances described by the first and second elements of Application Note 3 to Guidelines section 4A1.2 depend upon the character of a defendant's criminal conduct. Therefore, they are distinct from the third element, whose relevance depends upon whether the determination of guilt or the imposition of punishment for two or more of the defendant's prior offenses were combined. Conse-quently, in employing this part of the Application Note we must look to the court records of the defendant's prior offenses to see whether a decision was made to consolidate those offenses for trial or sentencing. The decision to consolidate trials is expressed by the defendant's trial under one multiple-count indictment or information, or by a single trial on charges against the defendant contained in multiple indictments or informations. Similarly, the decision to consolidate sentencings is expressed by the dedication of a single proceeding to imposing punishment for verdicts reached in two or more trials. See United States v. Manuel, 944 F.2d 414, 416 (8th Cir.1991) (holding defendant's trials and sentencings were not consolidated because the trials were conducted in separate jurisdictions and the "sentences were not imposed in the same proceeding"); United States v. Metcalf, 898 F.2d 43, 46 (5th Cir.1990) (holding sentences imposed on the same day were not consolidated where sentencing proceeded under separate docket numbers and there was no order consolidating the two cases for sentencing purposes); United States v. Jackson, 883 F.2d 1007, 1008 (11th Cir. 1989) (holding two prior robberies were consolidated for trial even though they were committed eight days apart and indicted separately, since the adjudication of guilt for both offenses occurred at one trial), cert. denied, 493 U.S. 1032, 110 S.Ct. 747, 107 L.Ed.2d 764 (1990).[4]

██ That Tracy was convicted in two separate proceedings and was sentenced in two separate proceedings by different courts having separate jurisdictions is enough, standing alone, to support the District Court's decision. See Manuel, 944

---

4. Although this rule is fairly rigid, we note that district courts may use the facts supporting an unsuccessful consolidation argument to impose a lesser sentence than that recommended by the Guidelines if the defendant's criminal history has been over-represented. See United States v. Senior, 935 F.2d 149, 151 (8th Cir.1991) (stating fact that previous sentences ran concurrently may help justify a downward departure where the district court was convinced the defendant's criminal history score inaccurately portrayed him as a career offender). By the same token, a district court may use cases that were consol-idated for trial or sentencing to enhance a defendant's sentence where failure to do so would under-represent the seriousness of his criminal history. See United States v. Ocasio, 914 F.2d 330, 335 (1st Cir.1990) ("[I]f essentially unconnected state offenses are lumped together for, say, administrative convenience, without any apparent rhyme or reason in terms of the Sentencing Commission's articulated aims, and the agglomeration thereafter skews the guideline calculus, then a circumstance sufficiently 'unusual' to warrant [upward] departure may be found to exist.").

F.2d at 416 (holding sentencings were not consolidated because defendant's "sentences were not imposed in the same proceeding" and because they were imposed by separate jurisdictions); *United States v. Rivers,* 929 F.2d 136, 139 (4th Cir.1991) (reversing decision that sentencings in the Circuit Courts of Baltimore City and Baltimore County were consolidated because, *inter alia,* the convictions were adjudicated "in different courts having separate jurisdiction and they were entered five months apart"), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). Even assuming a single jurisdiction had imposed these sentences, the bare fact that they were concurrent is not enough to show a decision to dedicate a single proceeding to imposing penalties for the offenses. *See Metcalf,* 898 F.2d at 46 (rejecting contention that concurrency of sentences shows that prior offenses were consolidated for sentencing). The District Court did not err in attributing criminal history points to Tracy based on both his August 1987 conviction for theft and his October 1989 conviction for possession of cocaine.

## VI

The convictions of Tracy and Joseph Watson are affirmed. Only Tracy Watson appealed his sentence; that sentence is affirmed.