_____

No. 95-1273
_____

United States of America,     *
                                  *
     Plaintiff - Appellee,     *
                                  *
     v.                              *
                                  *
Jose Isaias Maza, also known     *
as Joe,     *
                                  *
     Defendant - Appellant.     *

_____          Appeals from the United States
                                  District Court for the
No. 95-1932          District of Minnesota.
_____

United States of America,     *
                                  *
     Plaintiff - Appellee,     *
                                  *
     v.                              *
                                  *
Richard Anthony Leiphardt,     *
also known as Tony,     *
                                  *
     Defendant - Appellant.     *

_____

No. 95-1933
_____

United States of America,     *
                                  *
     Plaintiff - Appellee,     *
                                  *
     v.                              *
                                  *
Jeffrey Douglas Walker,     *
                                  *
     Defendant - Appellant.     *

United States of America,                *
                                          *
    Plaintiff - Appellant,                *
                                          *
    v.                                    *
                                          *
Richard Anthony Leiphardt,                *
also known as Tony; Jeffrey               *
Douglas Walker,                           *
                                          *
    Defendants - Appellees.               *

Submitted:  February 14, 1996

Filed:  August 27, 1996

Before McMILLIAN, LAY, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Jose Isaias Maza, Richard Anthony Leiphardt, and Jeffrey Douglas Walker appeal from their convictions on drug charges pursuant to 21 U.S.C. §§ 841(a)(1) and 846.  Maza and Walker also contend the district court erred in calculating their sentences.  The government cross appeals, seeking remand and resentencing of Leiphardt under the Sentencing Guideline provisions for d-methamphetamine.  We affirm on the appeals and reverse and remand for resentencing on the cross appeal.

## I.

This case involves a conspiracy to sell large quantities of methamphetamine in central Minnesota.  Viewed in the light most

favorable to the jury's verdict, see United States v. Cunningham, 83 F.3d 218, 222 (8th Cir. 1996), the evidence reveals the following facts.

In approximately 1990, one Michael Huggett, then a resident of California, began purchasing methamphetamine from Wesley Arnold of Pomona, California. Arnold's source for the methamphetamine was Richard Anthony Leiphardt, also known as Tony. Huggett originally purchased a few ounces of methamphetamine at a time and mailed the drugs to Minnesota for distribution. The quantity of methamphetamine eventually increased to approximately one-half pound per shipment. When Huggett moved to Minnesota, Arnold began mailing the methamphetamine to Huggett.

In January 1991, law enforcement officers intercepted a package containing one-half pound of methamphetamine sent from Arnold to Huggett. Huggett was arrested but was acquitted on the charges. Not long after his acquittal, Huggett resumed his drug dealings. To avoid detection by law enforcement officers, he solicited Peter Verdon to transport the methamphetamine from California to Minnesota.

At first, Verdon dealt with Arnold, who had purchased the drugs from Leiphardt, but Verdon eventually went around Arnold and obtained the methamphetamine directly from Leiphardt. In the summer of 1992, when Verdon went to California to purchase methamphetamine for Huggett, Arnold and Leiphardt met him at Arnold's residence. They told Verdon they wanted to deal with him, rather than Huggett, because Huggett was not paying his bills. Verdon purchased a pound of methamphetamine, and thereafter Huggett became Verdon's customer, and Verdon was no longer a courier for Huggett.

Under Verdon's management, the methamphetamine business grew, with Verdon eventually purchasing five pounds of methamphetamine

from his California suppliers every six to eight weeks. Arnold paid Leiphardt $8,500 per pound of methamphetamine and, in turn, sold it to Verdon for $15,000 per pound.

After a period of time, Leiphardt increased the price he was charging Arnold for the drugs to $11,500 per pound. Arnold responded by finding a new supplier, Jose Isaias Maza. Maza charged Arnold only $7,500 per pound, and Arnold and Maza split the profits generated from selling the methamphetamine to Verdon. Not surprisingly, since the laws of economics apply to both legal and illegal enterprises, Leiphardt then reduced his prices. From that point on, Arnold purchased methamphetamine from both Maza and Leiphardt. Sometimes the methamphetamine Arnold sold to Verdon had been supplied in part by Maza and in part by Leiphardt. For example, Verdon met Arnold and Leiphardt in Las Vegas in January 1993 and bought four pounds of methamphetamine, two from Leiphardt and two from Arnold supplied by Maza.

At one point, Leiphardt telephoned Verdon, seeking to become Verdon's sole supplier. The two agreed that Leiphardt would fly to the Minneapolis-St. Paul Airport, where Verdon would pick him up. According to plan, Verdon picked up Leiphardt at the airport on July 10, 1993, and the two drove to Cosmos, Minnesota. They then drove to a motel in Sioux Falls, South Dakota, where they met Jeffrey Walker, an associate of Leiphardt who had transported the methamphetamine from California in Leiphardt's red pickup truck. Leiphardt and Verdon removed the spare tire from the pickup truck and brought it into the motel room. There, they removed from the tire approximately three pounds of methamphetamine, which Verdon purchased. Leiphardt and Verdon discussed using a storage locker in Sioux Falls to store methamphetamine in the future.

A few weeks later, Verdon and Leiphardt again met in Sioux Falls. As before, Walker couriered the methamphetamine -- this time approximately ten pounds -- from California in Leiphardt's

4

pickup truck.  Verdon purchased about five pounds of the methamphetamine. He also returned to Leiphardt some methamphetamine that lacked potency. Verdon had purchased the "bad batch" of methamphetamine from Arnold, who had received it from Maza.  Leiphardt took the methamphetamine and told Verdon he would return it to Arnold.  (Leiphardt never did give the drugs to Arnold.)  About three weeks later, Verdon purchased another five pounds of methamphetamine from Leiphardt.

Around the time of this last transaction, Maza contacted Verdon, seeking to deal directly with him.  Verdon and Maza arranged to meet in Nevada, where Verdon exchanged a 1968 Corvette and cash for approximately five pounds of methamphetamine.  Still owing on the drugs, Verdon subsequently gave Maza a 1974 Corvette as additional payment.

On January 11, 1994, Verdon and his wife flew to Las Vegas.  He telephoned Maza several times, charging the calls on his telephone credit card.  He and his wife drove a rented car to San Bernadino, California, where he was to purchase five pounds of methamphetamine from Maza.  En route, he called to tell Maza he was on his way.  Maza gave Verdon the number for Maza's pager.  When Verdon arrived in San Bernadino, he stopped to page Maza from a pay phone.  Maza called Verdon back and arranged the meeting place.

Verdon and his wife checked into a hotel.  A few hours later, he went to the appointed place, where Ismael Avila delivered a box wrapped as a wedding gift.  Verdon gave Avila five envelopes, each containing $10,000 cash.  Verdon took the package back to his motel and unwrapped it.  It contained five pounds of methamphetamine.  Verdon and his wife later checked out of the hotel and went to a restaurant.  When they left the restaurant, police officers approached them, searched the trunk of the car, and upon discovering the methamphetamine, arrested Verdon.

5

Verdon was interviewed in San Bernadino by special agents of the Minnesota Bureau of Criminal Apprehension (MBCA) and by a local police officer. He told the officers he had another source named "Tony," who was later identified as Richard Anthony Leiphardt, from whom he had purchased multi-pound quantities of methamphetamine. He also explained that an associate of Tony's (Jeffrey Walker) transported the methamphetamine to Sioux Falls in Leiphardt's red pickup truck. At the conclusion of the interview, the officers released Verdon and told him he should contact an agent with the MBCA if he wished to cooperate in the investigation.

Verdon contacted the agent on January 22, 1994, advising him that Leiphardt had called and was on his way to Verdon's residence. Based on past experience, Verdon expected that Leiphardt had methamphetamine in Sioux Falls. The agent asked Verdon to delay the deal for a few days to give the agent time to plan for it. The agent called an officer of the Cosmos Police Department and asked the officer to conduct a surveillance on Verdon's home.

While conducting the surveillance, the officer saw a red Toyota pickup truck with California license plates stop at Verdon's residence. The truck was registered to Leiphardt. Having been instructed to obtain the identities of the people in the truck, the officer stopped the truck for having too high a bumper.[1] The driver identified himself as Walker, and the passenger identified himself as Leiphardt. After obtaining the identities of the occupants of the truck, the officer allowed them to proceed, without conducting a search. Leiphardt and Walker left without meeting with Verdon.

-----

[1]See Minn. Stat. Ann. § 169.73(4) (West Supp. 1996) (setting the maximum bumper height for a pickup truck at 25 inches from bottom of bumper to the ground, and declaring a violation to be a misdemeanor).

The next morning, officers in Sioux Falls, South Dakota, located Leiphardt's pickup truck outside of a motel.  They began watching the vehicle.  It was determined that if the vehicle went south or west, it should be stopped.  If the vehicle traveled east, however, they would allow it to proceed, for a drug deal with Verdon might transpire.

When the truck began travelling west, a state trooper stopped the vehicle for failure to signal a lane change, for speeding, and for failure to affix a front license plate as required under California law.  The trooper asked Leiphardt if there were any weapons in the vehicle.  Leiphardt responded affirmatively.  At the trooper's request, Leiphardt revealed in a duffel bag a loaded .380 semi-automatic handgun, a 12 gauge assault-style shotgun, a 9 millimeter semi-automatic handgun, and large quantities of ammunition.  Under South Dakota law, it is unlawful to possess a loaded weapon in a vehicle.  S.D. Codified Laws §§ 22-14-9, 22-6-2 (1988).  The trooper arrested Leiphardt and Walker, and proceeded to search the vehicle.

Several items were seized, including two pagers, which Walker had purchased under a false name, an address book, which contained a telephone number for a storage facility in Sioux Falls, and a hotel receipt revealing that Walker had rented a motel room under a false name on January 21, 1994.  Further investigation revealed that Walker had rented a storage locker in Sioux Falls, also under the false name.

The government charged Leiphardt, Walker, Maza, and Avila, as well as thirteen other defendants, in a seventeen-count Superseding Indictment.  All of the defendants were named in Count I, which charged conspiracy to distribute and to possess with intent to distribute methamphetamine.  Maza and Avila were also named in Count X, which charged distribution of approximately 3.87 pounds of methamphetamine.  Leiphardt and Walker filed motions to suppress

7

the evidence obtained as a result of the vehicle stops.  Adopting the United States magistrate judge's[2] report and recommendation, which was issued after a motions hearing, the district court denied the motions.

The case proceeded to trial on Counts I and X with four defendants: Leiphardt, Walker, Maza, and Avila.  A jury found Leiphardt, Walker, and Maza guilty as charged.  Avila was acquitted.  Maza was sentenced as a career offender, receiving a sentence of 360 months (30 years) of imprisonment.  Leiphardt and Walker were each sentenced to 120 months (10 years) of imprisonment.  All three defendants appeal their convictions.  Walker and Maza also appeal their sentences.  The government cross appeals as to Leiphardt's sentence.

## II.

### A.  DENIAL OF MOTIONS TO SUPPRESS

Leiphardt and Walker argue the district court erred in denying their motions to suppress evidence stemming from the vehicle stops in Cosmos, Minnesota, and Sioux Falls, South Dakota.  "We must affirm the district court's denial of the motion[s] to suppress unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, [we] are left with the definite and firm conviction that a mistake has been made."  United States v. Heath, 58 F.3d 1271, 1275 (8th Cir.) (internal quotations omitted), cert. denied, 116 S. Ct. 240 (1995).

Appellants first argue that the lower court erred in finding that traffic violations provided legitimate bases to stop the

---

[2]The Honorable J. Earl Cudd, United States Magistrate Judge for the District of Minnesota.

pickup truck in Cosmos, Minnesota and in Sioux Falls, South Dakota. They argue that the traffic violations were mere pretext, because the real reasons related to the investigation of criminal activity. Further, it is argued that because the alleged investigative stops were not supported by reasonable suspicion, they were in violation of the Fourth Amendment guarantee against unreasonable seizures.

The district court correctly concluded that probable cause to suspect that a traffic violation had occurred was sufficient legal basis for both stops, regardless of any other motives the stopping officers may have had. Whren v. United States, 116 S. Ct. 1769, 1774 (1996). See also United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) ("Any traffic violation, however minor, provides probable cause for a traffic stop."), cert. denied, 115 S. Ct. 1970 (1995); United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990) (holding that we look to whether the officer was legally authorized to make the stop, not to the officer's intent), cert. denied, 502 U.S. 962 (1991). As the Supreme Court recently explained,

> "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

Whren, 116 S. Ct. at 1774 (quoting Scott v. United States, 436 U.S. 128, 138 (1978)). Thus, the district court correctly applied the law.

Pointing to the government's failure to call as witnesses the officers who actually made the stops, Leiphardt and Walker argue the government failed to prove that the legal justifications for the traffic stops existed. We disagree. "[T]he trial court may accept hearsay evidence at a suppression hearing if the court is

9

satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness." United States v. Boyce, 797 F.2d 691, 693 (8th Cir. 1986). An agent from the MBCA who was assigned to the case testified at the suppression hearing that the pickup truck had been stopped in Cosmos for an equipment violation and in Sioux Falls for failing to have a front license plate as required in California, for failing to signal, and for speeding. Appellants took advantage of their right to cross examine the agent, and the district court found the agent's testimony credible. Because the Appellants have not pointed us to anything that would cast serious doubt on this finding, we decline to question the district court's finding. Heath, 58 F.3d at 1275 ("A district court's determination as to the credibility of a witness is virtually unreviewable on appeal.").

We further conclude that the evidence obtained as a result of the Sioux Falls, South Dakota, stop was properly admitted. During the stop, the officer asked the defendants whether there were any guns in the pickup truck. The defendants revealed loaded firearms in the vehicle, in violation of South Dakota Codified Laws § 22-14-9. The officer then lawfully arrested the defendants. See S.D. Codified Laws 23A-3-2 (authorizing warrantless arrests for public offenses committed in an officer's presence). Once the occupants of the vehicle were arrested, a search of the passenger compartment of a vehicle was permissible. New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Riedesel, 987 F.2d 1383, 1388 (8th Cir. 1993). Viewing this course of events, we find nothing improper in the vehicle stop, the warrantless arrest, or the search incident to the arrest.

In a related claim, Leiphardt also contends he was denied a fair trial because the guns seized when he was arrested in Sioux Falls were admitted as evidence at the trial absent proof of any connection to the crime charged. We review the admission of the firearms only for plain error, because no objection was lodged at

the trial. (Trial Tr. 149-54.); Fed. R. Crim. P. 52(b) (plain error standard). Firearms are generally considered tools of the drug trade. United States v. Schubel, 912 F.2d 952, 956 (8th Cir. 1990). As such, the presence of firearms in Leiphardt's vehicle was relevant to his participation in the conspiracy to distribute methamphetamine and did not prejudice his right to a fair trial. The district court therefore did not commit error, much less plain error, in admitting the guns. See United States v. Norton, 846 F.2d 521, 525 (8th Cir. 1988) (standard of review).

**B.    404(b) EVIDENCE**

During the trial, the prosecutor asked Arnold why he had initially believed Leiphardt could supply methamphetamine. Arnold answered that Leiphardt had sold marijuana in approximately 1987. Leiphardt objected and moved for a mistrial, on the basis that the testimony was inadmissible under Federal Rule of Evidence 404(b),[3] and even if the evidence met any of the exceptions of Rule 404(b), it was still inadmissible because the prosecutor had failed to provide Leiphardt the requisite pretrial notice. The prosecutor responded that the testimony was offered for the purpose of showing why Arnold went to Leiphardt to obtain methamphetamine and explained the information had not been available in time to provide notice, because Arnold had pled guilty only two days before. The district court denied Leiphardt's motion for a mistrial; however,

---

[3]Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

11

the court struck the testimony and instructed the jury to disregard it, reasoning that the evidence's relevancy was questionable and it had come in without advance notice to the defendants.

We afford the district court broad discretion in determining whether a defendant has been so prejudiced that a mistrial is warranted.  United States v. Robinson, 774 F.2d 261, 277 (8th Cir. 1985).  "The admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony."  United States v. Nelson, 984 F.2d 894, 897 (8th Cir.), cert. denied, 508 U.S. 966 (1993).  In those circumstances, we will reverse only if the verdict was substantially swayed in spite of the instruction; that is, we will reverse when, considering the testimony in the context of the entire trial and the strength of the government's evidence regarding the defendant's guilt, the allegedly prejudicial testimony was not harmless error.  Id.

Assuming, without deciding, that the testimony was inadmissible under Rule 404(b), we find no abuse of discretion in the district court's denial of Leiphardt's motion for a mistrial.  The district court struck the allegedly improper testimony and instructed the jury to disregard it.  We assume the jury followed this instruction.  United States v. Karam, 37 F.3d 1280, 1288 (8th Cir. 1994), cert. denied, El Hani v. United States, 115 S. Ct. 1113 (1995).  Moreover, we do not believe the statement at issue here could have substantially swayed the jury in reaching its verdict.  The testimony was elicited on the third day of a trial that lasted more than two weeks, and the government submitted powerful evidence of Leiphardt's guilt.  We therefore hold that the district court did not abuse its discretion in denying Leiphardt's motion for a mistrial.

Maza brings a similar argument, contending the district court erred by denying his motion for a mistrial based upon two statements made by codefendant Ismael Avila concerning Maza's prior

12

convictions.  Avila testified that he had lied, at Maza's request, in an affidavit he had prepared when the two codefendants were in jail in California.  On cross examination, Maza's counsel asked Avila whether Maza had ever threatened either Avila or his family.  Avila described a conversation he had had with Maza, stating:

> He said, don't take it like a threat, but I have got people up there that, you know, will do things for me.  I am looking at 20 years.  I got two priors.

(Trial Tr. at 1800-01.)  Maza's counsel did not object to this testimony. When Avila's counsel questioned Avila on re-direct, Avila said that the idea of preparing an affidavit came up when Maza stated, "[Y]ou going to have to help me. I got priors."  (Id. at 1812.)  Maza's counsel then objected and moved for a mistrial.  The district court denied the motion because Maza's counsel had elicited the testimony initially and had not objected to it.

We find no abuse of discretion in the district court's denial of Maza's motion.  Avila's attorney had previously informed Maza's attorney of how Avila would testify on his reasons for allegedly lying in preparing the affidavit.  Notwithstanding this, Maza's attorney elicited the first statement at issue here, thus opening the door into this area of inquiry, and then failed to raise an objection.  The second statement, elicited by Avila's attorney on redirect, simply reiterated Maza's alleged threat, including a reference to his "priors."  The statement did not provide any additional, specific information about the prior convictions.  Considering that Maza's counsel elicited the first statement and did not object to it, and that the second statement did not provide any additional information, we conclude that the evidence was admissible.  Furthermore, because the prior convictions of Maza were never again referred to in this lengthy trial and the government's evidence against Maza was overwhelming, the reference to "priors" could not have substantially swayed the jury.

13

Accordingly, the district court's decision to deny Maza's motion for a mistrial was not an abuse of discretion.

## C.  JURY INSTRUCTIONS

Leiphardt and Walker argue the district court erred by refusing to instruct the jury on multiple conspiracies.  The "issue of whether the defense produced sufficient evidence to sustain a particular instruction, such as a multiple conspiracy instruction, is generally a question of law subject to de novo review."  United States v. Jackson, 67 F.3d 1359, 1367 (8th Cir. 1995), cert. denied, 116 S. Ct. 1684 (1996).  If the evidence sufficiently supports only a theory of a single conspiracy, a district court does not err by refusing to give multiple conspiracy instructions.  Id.  We find no error here.

"A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement."  United States v. Davis, 882 F.2d 1334, 1342 (8th Cir. 1989), cert. denied, 494 U.S. 1027 (1990).  In a conspiracy case, the government must prove there was an agreement among the defendants to achieve some illegal purpose and that each defendant "knowingly contributed efforts in furtherance of [the conspiracy]."  United States v. Lewis, 759 F.2d 1316, 1352 (8th Cir.) (internal quotation and alteration omitted), cert. denied, 474 U.S. 994 (1985).  The fact that various defendants entered the conspiracy at different times and performed different functions does not convert a single conspiracy to multiple conspiracies.  United States v. Baker, 855 F.2d 1353, 1357 (8th Cir. 1988), cert. denied, 490 U.S. 1069 (1989).  In a drug case, the fact that different individual defendants contributed a portion of the total drugs to suppliers or participated in numerous separate transactions does not convert a single conspiracy to multiple conspiracies.  United States v. Spector, 793 F.2d 932, 935 (8th Cir. 1986), cert. denied, 479 U.S. 1031 (1987).  Furthermore,  the fact that coconspirators may change

14

roles in the conspiracy or even depart from the conspiracy may signal only that the single conspiracy has moved to a new phase. <u>Davis</u>, 882 F.2d at 1342.

After careful review, we conclude that this record does not sufficiently support the defendants' theory of multiple conspiracies; it supports a single conspiracy to sell a large quantity of methamphetamine in central Minnesota. Initially, Verdon obtained the methamphetamine from Arnold, who in turn obtained it from either Leiphardt or Maza. Both Maza and Leiphardt knew of each other's business with Arnold, and in fact, on at least one occasion, Arnold purchased the methamphetamine in part from Leiphardt and in part from Maza. Moreover, Leiphardt took back a "bad batch" of methamphetamine that Maza had supplied. When Leiphardt eventually began to sell the drugs directly to Verdon, Walker became involved in the conspiracy, transporting the drugs from California to South Dakota and using a false name to obtain a motel room, pagers, and a storage locker. Because this record does not support a theory of multiple conspiracies, the district court did not err in refusing to instruct the jury on multiple conspiracies.

**D.  SUFFICIENCY OF THE EVIDENCE**

In a similar vein, Leiphardt and Walker challenge the district court's denial of their motions for acquittal, arguing that the evidence is insufficient to support the verdicts against them because there is a fatal variance between the single conspiracy charged and the proof offered at trial. To prevail on this argument, the defendants must establish that a variance existed and that the variance affected their substantial rights. <u>United States v. Rabins</u>, 63 F.3d 721, 724 (8th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 1031 (1996). Hence, the issue is whether the evidence is sufficient to demonstrate a single overall conspiracy to distribute methamphetamine, and whether the defendants knowingly joined the

15

conspiracy and participated in furthering its objectives.  Id.  Once the government has established the existence of a conspiracy, even slight evidence connecting a particular defendant to the conspiracy is sufficient to prove the defendant's involvement in the conspiracy.  United States v. Scott, 64 F.3d 377, 380 (1995).

We view the evidence in the light most favorable to the jury's verdict, resolving all reasonable inferences in favor of the verdict.  Rabins, 63 F.3d at 724.  We will uphold a jury verdict if there is an interpretation of the evidence that would permit a reasonable jury to find guilt beyond a reasonable doubt.  United Sates v. Erdman, 953 F.2d 387, 389 (8th Cir.), cert. denied, 505 U.S. 1211 (1992).  As we explained above, and considering the evidence in the light most favorable to the verdict, the evidence in this case abundantly supports the government's theory of a single conspiracy.  Furthermore, the government surpassed the threshold of producing slight evidence connecting both Leiphardt and Walker to the conspiracy.

Maza challenges his verdict too, contending the evidence was insufficient to convict him because the witnesses who testified against him (Arnold and Verdon) were unbelievable.  This argument lacks merit.  Credibility determinations are in the jury's province, not that of the reviewing court.  Cunningham, 83 F.3d at 222.  Further, "[a] conviction can properly rest on the uncorroborated testimony of an accomplice if it is not otherwise incredible or unsubstantial on its face."  United States v. Evans, 697 F.2d 240, 246 (8th Cir.), cert. denied, 460 U.S. 1086 (1983).  The jury evidently found Verdon's and Arnold's detailed explications of the facts, which are bolstered by other substantial evidence in the record, to be true.  We cannot say their testimony is either incredible or unsubstantial.  Accordingly, the evidence is sufficient to support the guilty verdict against Maza.

**E.  SENTENCING MAZA AS A CAREER OFFENDER**

The Presentence Investigation Report for Maza reveals that he has two prior convictions: a conviction in California for selling cocaine on August 13, 1985, and a conviction in Arizona on drug charges stemming from a sale of cocaine on February 6, 1986.  Accordingly, the district court sentenced Maza as a career offender pursuant to the Sentencing Guidelines.  United States Sentencing Commission, <u>Guidelines Manual</u>, § 4B1.1 (Nov. 1994).  Maza claims this was error, arguing his prior convictions were related because he entered into a single plea agreement for both convictions.

Persons who are convicted of a crime of violence or a controlled substance offense and who have two prior felony convictions for either of such crimes are sentenced as "career offenders."  USSG § 4B1.1.  Prior felony convictions are counted separately for career offender purposes if they "are counted separately under the provisions of § 4A1.1(a), (b), or (c)."  USSG § 4B1.2(3).  Under section 4A1.2(a)(2), "prior sentences imposed in related cases are to be treated as one sentence."  "[P]rior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing."  USSG § 4A1.2, comment. (n.3).

We review de novo a district court's legal interpretation of Section 4A1.2(a)(2).  <u>United States v. Watson</u>, 952 F.2d 982, 990 (8th Cir. 1991), <u>cert. denied</u>, 503 U.S. 994 (1992).  We review for clear error a district court's determination of whether the government has proven that a defendant's prior crimes were unrelated.  <u>United States v. Lublin</u>, 981 F.2d 367, 371 (8th Cir. 1992).

The district court did not err in finding Maza's prior convictions to be unrelated.  First, the two crimes occurred on

17

different occasions, almost six months apart.  Second, besides the distance in time, the drug sales took place in different states and involved different customers.  We agree with the Second Circuit that, as a matter of common sense, a single common scheme or plan involves "something more than simply a repeated pattern of conduct."  <u>United States v. Chartier</u>, 970 F.2d 1009, 1016 (2d Cir. 1992).  We therefore see no error in the district court's conclusion that the crimes were not part of a "single common scheme or plan."   Finally, the crimes were not "consolidated for trial or sentencing," USSG § 4A1.2, comment. (n.3), because no formal order of consolidation was issued and the cases proceeded to sentencing under separate docket numbers.  <u>United States v. Klein</u>, 13 F.3d 1182, 1185 (8th Cir.), <u>cert. denied</u>, 114 S. Ct. 2722 (1994); <u>United States v. McComber</u>, 996 F.2d 946, 947 (8th Cir. 1993).  The district court therefore properly sentenced Maza as a career offender.

## F.   SENTENCING LEIPHARDT FOR D-METHAMPHETAMINE

The government argues in its cross-appeal that the district court clearly erred in finding the government failed to prove Leiphardt and Walker had distributed d-methamphetamine and, accordingly, in sentencing them under the lower guideline provisions for distribution of l-methamphetamine.  Both Leiphardt and Walker were sentenced to 120 months

18

pursuant to the mandatory minimum statute.[4]  The government does not seek the resentencing

<hr>

[4]Offenses involving "100 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers" are subject to a 10-year mandatory minimum.  21 U.S.C. § 841(b)(1)(A)(viii).  This mandatory minimum statute, unlike the Sentencing Guidelines, does not differentiate between d-methamphetamine and l-methamphetamine.  When "a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."  USSG § 5G1.1(b).  <u>See also</u> <u>United States v. Stoneking</u>, 60 F.3d 399, 402 (8th Cir. 1995) (en banc) (explaining that the Sentencing Commission cannot override Congress), <u>cert. denied</u>, 116 S. Ct. 926 (1996).  Concluding that the statutory minimum of 120 months was greater than the applicable Guideline range, the district court sentenced both Leiphardt and Walker to 120 months of imprisonment.

of Walker, as his 120-month sentence as imposed falls within the applicable ordinary guideline range of 108 to 135 months for a conviction of an offense involving this quantity of d-methamphetamine. The government does seek the resentencing of Leiphardt, however, because his 120-month sentence is below the applicable ordinary guideline range for offenses involving the quantity of d-methamphetamine attributable to him.

Under the Sentencing Guidelines applicable to this case,[5] a sentence for d-methamphetamine is greater than a sentence for l-methamphetamine by a factor of 25. See USSG § 2D1.1, n.10 (Drug Equivalency Table). A district court must make a factual finding as to whether the methamphetamine was d- or l-methamphetamine. United States v. Koonce, 884 F.2d 349, 352 (8th Cir. 1989). The government bears the burden of proving by a preponderance of the evidence that the methamphetamine was d- not l-methamphetamine. United States v. Jennings, 12 F.3d 836, 838 (8th Cir. 1994). We review the district court's finding for clear error. Id.

After careful review, we are firmly convinced that the district court clearly erred in finding the government failed to meet its burden of proof on this sentencing issue. Verdon's testimony linked two samples of methamphetamine to Leiphardt and one of them to Walker. Laboratory testing revealed that both

---

[5]As of November 1, 1995, the distinction between methamphetamine types has been eliminated, and l-methamphetamine is now treated the same as d-methamphetamine. See USSG § 2D1.1. Amendment number 518 explains that the change was made because "l-methamphetamine is rarely seen and is not made intentionally, but rather results from a botched attempt to produce d-methamphetamine." USSG App. C at 423.

20

samples were d-methamphetamine.  Moreover, the government's expert testified at the sentencing hearing that l-methamphetamine has little, if any, of the stimulating effect to the central nervous system that d-methamphetamine has.  Because the government's case against Leiphardt involved numerous multi-pound drug transactions over a period of time, and because Verdon testified he had never received any complaints from his customers about the methamphetamine he received from Leiphardt and Walker, we are firmly convinced that the methamphetamine Leiphardt was dealing was d-methamphetamine.  As such, Leiphardt should be resentenced under the guideline provisions for d-methamphetamine.

## III.

For the reasons discussed above, we affirm the district court's judgments on the defendants' appeals.  We affirm Leiphardt's conviction but vacate his sentence and remand for resentencing of Leiphardt on the government's cross appeal.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

21